# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Monroe Land Investments | : | |
| | : | |
| v. | : | No. 571 C.D. 2017 |
| | : | Argued: March 6, 2018 |
| Zoning Board of Adjustment and The | : | |
| City of Philadelphia and Broad Street | : | |
| West Civic Assoc. and John Furey | : | |
| | : | |
| Appeal of: John Furey and Broad | : | |
| Street West Civic Assoc. | : | |


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE P. KEVIN BROBSON, Judge
            HONORABLE MICHAEL H. WOJCIK, Judge


OPINION BY
JUDGE COHN JUBELIRER                          FILED:  March 26, 2018

John Furey and Broad Street West Civic Association (Appellants) appeal from an Order of the Court of Common Pleas of Philadelphia County (common pleas), dated March 28, 2017, which granted the appeal of Monroe Land Investments (Monroe), reversed the decision of the Zoning Board of Adjustment of the City of Philadelphia (ZBA) denying Monroe's application for a special exception (Application), and directed the Philadelphia Department of Licenses and Inspections (L&I) to issue a zoning permit.  The Appellants contend that common pleas disregarded the ZBA's credibility determinations and substituted its judgment for that of the ZBA.  Because common pleas correctly determined that the ZBA's

decision was not supported by substantial, competent evidence, we affirm common pleas' Order.

Monroe is the owner of property located at 2640 South Carlisle Street in Philadelphia (the Property), which is improved with a one-story, semi-detached building. The Property is located within the CMX-2, Neighborhood Commercial Mixed-Use-2 Zoning District. Monroe applied to L&I for a zoning/use registration permit to use the Property as a Dunkin' Donuts store (the Project). (ZBA Opinion (Op.), Findings of Fact (FOF) ¶ 1.) Dunkin' Donuts, because it is considered a take-out restaurant, requires a special exception under Table 14-602-2 of the Philadelphia Zoning Code (Zoning Code).[1] L&I referred Monroe's Application to the ZBA, which held a hearing.

## I.    ZBA Hearing

At the hearing, evidence was presented showing that the Property is on a corner and has frontage on both South Carlisle Street and Oregon Avenue. South Carlisle Street is a one-way street with row houses. Oregon Avenue is an east-west, five-lane arterial roadway on which numerous commercial businesses are located. (Transportation (Transp.) Analysis, Reproduced Record (R.R.) at 308a.) A few hundred feet away is South Broad Street. Around the corner, at the intersection of South Broad Street and Oregon Avenue, is the Philadelphia Performing Arts Charter School. There is another charter school at the corner of South Broad Street and Shunk Street. About three blocks from the Property, at South 18th Street and Oregon Avenue, is another Dunkin' Donuts (the 18th Street Dunkin' Donuts), which Monroe also operates. The 18th Street Dunkin' Donuts operates 24 hours a day and has a

---

[1] Monroe's Application initially included a request for two variances to permit the use of digital and internally illuminated signs, but Monroe later withdrew those requests.

2

full parking lot, but no drive-thru. The Property previously had been used as a 7-Eleven and then a NAPA Auto Parts (NAPA) store. Six months after the NAPA store closed, Monroe purchased the Property.

The building on the Property is approximately 2,532 square feet, approximately 16 feet high, and set back from Oregon Avenue by approximately 58 feet. As part of the Project, Monroe proposed reconfiguring the parking lot to allow for three parking spaces, one of which would be designated for handicapped parking. Vehicles would enter the lot from Oregon Avenue and pull into parking spots facing west and parallel with Oregon Avenue, which would enable patrons to pull out of the lot and onto Oregon Avenue facing forward. The building would have 14 seats for patrons and 2 bathrooms. Lighting and security cameras would be installed at the Property. The Dunkin' Donuts would operate between 5:00 a.m. and 10:00 p.m. There would be no drive-thru. Deliveries would occur once a week. Garbage would be stored in tote containers rather than a dumpster in the rear yard and would be collected two or three times a week. Two new privacy fences would be erected on the Property: one to the north or rear of the Property on South Carlisle Street, and the other to the west of the Property, facing the rear of homes fronting South 15th Street. The latter would be equipped with vision stripes to block the glare from car headlights. A three-foot alley separating the rear of the Property from the adjacent residential home on South Carlisle Street would be preserved.

Albert Taus,[2] the Project architect, testified that he had provided designs for approximately 500 Dunkin' Donuts stores over the past 25 years. The proposed Dunkin' Donuts at the Property is considered a satellite store, meaning no food is prepared on site but is merely warmed prior to consumption. Venting is necessary

---

[2] Taus' testimony is found at pages 31a-42a of the Reproduced Record.

but only for hot air from a microwave, sandwich station, and a convection oven. (Hr'g Tr. 22, R.R. at 34a.) The vent would be located as far away as possible from the homes on South Carlisle Street and South 15th Street. Taus opined that the Project would not impair an adequate supply of light or air to any of the surrounding properties. Dunkin' Donuts satellite stores, Taus continued, have historically not had detrimental impacts on utilities, such as water, electricity, and sewer.

Frank Montgomery (Montgomery),[3] a traffic engineer with Traffic Planning and Design, Inc., (TPD), testified regarding a traffic analysis he conducted of the area surrounding the Property. Montgomery noted that over the past 20 years he had conducted numerous traffic impact and parking studies. Montgomery conducted a traffic count during the morning (7:00 a.m. to 9:00 a.m.) and evening (4:00 p.m. to 6:00 p.m.) rush hours and also observed traffic during the early afternoon when school is dismissed. Montgomery's traffic count noted that between 7:30 a.m. and 8:30 a.m., 421 vehicles traveling east passed South Carlisle Street, while 648 vehicles traveling west passed South Carlisle Street. (Transp. Analysis, Fig.3, R.R. at 316a.) Using an industry manual and other analyses TPD had conducted in Philadelphia, Montgomery projected that approximately 130 customers would frequent the Dunkin' Donuts between 7:30 a.m. and 8:30 a.m. (Transp. Analysis, R.R. at 310a; Hr'g Tr. at 33, R.R. at 45a.) However, Montgomery continued, given that this is a densely populated area and is in close proximity to mass transit, 75 percent of patron trips or about 100 patrons to the Dunkin' Donuts will not come via a vehicle. Thus, he estimated there will be about 30 cars entering and exiting the

_____

[3] Montgomery's testimony is found at pages 42a-59a of the Reproduced Record.

4

Property between 7:30 a.m. and 8:30 a.m., that is, one vehicle every 2 minutes.[4] (*Id.*) There would be "significantly" fewer customer trips to the Dunkin' Donuts in the afternoon. (Hr'g Tr. at 33, R.R. at 45a.) Montgomery noted that the proposed parking lot at the Dunkin' Donuts was small and this encouraged people to walk there. (Hr'g Tr. at 36, R.R. at 48a.) In addition, Montgomery opined that given most patrons would be familiar with the area, if a patron drove to the Dunkin' Donuts and saw no room to park, he would drive to the 18th Street Dunkin' Donuts where there is more parking. Looking at how the vehicle traffic to the Property would impact the traffic in the area, Montgomery concluded that the Project would not increase congestion in the public streets. (Hr'g Tr. at 41, R.R. at 53a.) Regarding the Philadelphia Performing Arts Charter School, Montgomery concluded that "the limited vehicular traffic associated with the proposed Dunkin['] Donuts, especially during the afternoon pickup times, will not significantly impact traffic in this area." (Transp. Analysis, R.R. at 313a.) Montgomery also concluded that given the infrequency of deliveries and trash collection to the Property, the Project would not be detrimental to the health, safety, and welfare of the neighborhood. (Hr'g Tr. at 41, R.R. at 53a.)

Russell Shoemaker,[5] a nearby resident, a member of the South Philadelphia Business Association, and president of the Police Advisory Board for South Philadelphia, testified that he has witnessed disturbances from kids at the 18th Street Dunkin' Donuts. Most of the kids are from outside the neighborhood and meet at the 18th Street Dunkin' Donuts. Shoemaker and the police then chase the kids from

---

[4] Montgomery anticipated that many of these vehicular trips would be "pass-by trips" (a trip made to the site while en route to another destination), but he showed them as "new trips" (a trip for the express purpose of visiting the site) in order to be conservative. (Transp. Analysis, R.R. at 310a.)

[5] Shoemaker's testimony is found at pages 54a-59a of the Reproduced Record.

one location to the next. Shoemaker did not believe the 18th Street Dunkin' Donuts is a nuisance. He thought the Project would relieve some of the pressure on the 18th Street Dunkin' Donuts.

In opposition to the Application, the ZBA received the following comments.[6] Peter Elliott from Councilman Kenyatta Johnson's (Councilman Johnson) office said that Councilman Johnson, having received several petitions opposing the Application, opposed it. Elliott noted that residents have complained to Councilman Johnson's office about drivers parking their cars in the middle of South Carlisle Street and then patronizing businesses on Oregon Avenue.

John Furey of the Broad Street West Civic Association commented that, as a result of the Project, "home values will depreciate, traffic congestion will increase, and their quality of life will be affected by noise, trash, and teens hanging out there." (Hr'g Tr. at 51, R.R. at 63a.) Furey opined that the proposed parking lot "is too small for the number of cars that these stores draw." (*Id.*) Noting that "in South Philadelphia[] everybody knows parking is crazy," Furey predicted that "[i]f there is a space[,] they are going to put two or three cars in there, go in and get their coffee." (Hr'g Tr. at 54, R.R. at 66a.) Furey also claimed that the 18th Street Dunkin' Donuts has a history of ignoring neighbors' complaints about it being a "public nuisance." (Hr'g Tr. at 52, R.R. at 64a.) Furey acknowledged that Monroe had modified its proposal to satisfy community concerns, with the exception of eliminating the parking lot, but neighbors remained opposed to the Project. Furey commented, "**we're opposed to it, period**." (Hr'g Tr. at 57, R.R. at 69a (emphasis added).)

---

[6] The comments are found at pages 59a-77a of the Reproduced Record.

Rose Mary LaCroce, whose home abuts the Property, commented that kids would loiter on the Property and hang over the privacy fence, just as they do at the 18th Street Dunkin' Donuts. She commented that "[o]n a normal day traffic is horrendous[,]" and that "[t]raffic is crazy no matter when you go." (Hr'g Tr. at 60, R.R. at 72a.) LaCroce acknowledged, however, that she "wasn't . . . happy . . . when the 7-Eleven was there[,]" and that the Property, being in the CMX-2 zone, could be used as a 24-hour gym as of right. (Hr'g Tr. at 61, R.R. at 73a.) LaCroce responded that "just because . . . you can do it, doesn't make it right[,]" and that "it doesn't mean that it's not going to impact those of us who live in that area." (*Id.*)

Raymond Luning, who lives across the street from the Property, commented that residents who live on South Carlisle Street, because it is so narrow, have to park on the pavement in order for the garbage truck to pass. Luning stated that with the Project he is "going to lose thousands and thousands of dollars [and] **I just don't want that place there. That's it**." (Hr'g Tr. at 63, R.R. at 75a (emphasis added).)

Roseanna Lord, a local resident, commented that when the 7-Eleven was operated at the Property, "[i]t was horrible." (Hr'g Tr. at 64, R.R. at 76a.) At night, when she had to walk by the 7-Eleven, she feared for her life. (*Id.*) She added that there were "[b]eggers," and "it was a very uncomfortable situation." (*Id.*)

Adelina LaCroce, another local resident, commented that any of the by-right uses for the CMX-2 zone would be better than the proposed use. She did not want any use involving food except for "an eat-in restaurant" because it "brings a different client[ele]." (Hr'g Tr. at 65, R.R. at 77a.) She commented that NAPA "was great" because it had "regular business hours, no food, no loitering, no littering." (*Id.*)

A letter from State Representative Maria P. Donatucci was submitted opposing the Application for the same reasons the commenters expressed.

7

In rebuttal, Monroe offered the testimony of Larry Persofsky,[7] a paralegal for the attorney representing Monroe, who reviewed crime data, as reported by the Philadelphia Police Department, which showed that there was one report of a robbery at the 18th Street Dunkin' Donuts between June 3, 2015, and December 30, 2015.

At the conclusion of the hearing, a representative from the City of Philadelphia Planning Commission (CPC) expressed that the CPC had no objection to granting Monroe's Application for a special exception since, "given the evidence and testimony given today, we believe that the standards for granting a special exception have been met."[8]  (Hr'g Tr. at 71, R.R. at 83a.)

The ZBA voted unanimously, 4-0, against granting Monroe a special exception.  Monroe then appealed to common pleas.  During the pendency of the appeal, the ZBA submitted findings of fact and conclusions of law.  In its findings of fact, the ZBA summarized the evidence presented at the hearing.  In its conclusions of law, the ZBA concluded "that the evidence of record does not support grant of the requested special exception."  (ZBA Op., Conclusions of Law (COL) ¶ 7.)  The ZBA continued:

> 8.      The Board specifically concludes that Applicant did not submit credible, objective evidence sufficient to establish that the proposed use will not cause congestion in the public streets or endanger public health or safety to a degree beyond that which might normally be expected from a takeout restaurant.

---

[7] Persofsky's testimony is found at pages 78a-81a of the Reproduced Record.

[8] The CPC's recommendation was made pursuant to Section 14-303(7)(c) of the Zoning Code, which states that the CPC "shall review each application for a special exception" and "make a recommendation to the [ZBA] as to whether the application meets the criteria for a special exception."  Phila., Pa., Zoning Code § 14-303(7)(c) (2016).

9.    The Board is persuaded by opponents' testimony regarding existing traffic patterns, congestion in the streets, and the proximity of two charter schools and residential uses that the proposed Dunkin' Donuts is substantially likely to cause a detrimental impact on the neighborhood's health, safety and welfare beyond that which might normally be expected from a takeout restaurant.

(*Id.* ¶¶ 8-9.)

## II.    Common Pleas' Decision

Common pleas,[9] which did not take additional evidence, reversed the ZBA, and granted the Application for a special exception. In its opinion issued pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 1925(a), common pleas concluded that the ZBA abused its discretion in that paragraphs 8 and 9 of its conclusions of law were not supported by substantial evidence. (Common Pleas Op. at 8.) Common pleas stated that Monroe had sustained its burden of proof by presenting relevant evidence including testimony from two experts, a community group, and local crime data, none of which the ZBA deemed incredible. (*Id.* at 9-10.) Monroe also demonstrated "compliance with each of the specific impacts set forth in the zoning code through unrebutted expert testimony." (*Id.* at 9.) In short, common pleas stated, Monroe "presented substantial, unrebutted, and objective evidence that the grant of the special exception for its Project would not cause specific detrimental impacts to the neighborhood beyond that which normally might be expected from the proposed use." (*Id.* at 10.) The objectors, in contrast, did not offer any expert testimony, but solely "lay opinion from near[by] neighbors." (*Id.*) This evidence, consisting of only "lay, personal opinion testimony about speculative harms" failed to meet the objectors' burden of

---

[9] The decision of common pleas was issued by the Honorable Daniel J. Anders.

9

proof. (*Id.* at 11.) Therefore, common pleas concluded, it properly reversed the ZBA's determination denying Monroe a special exception.

On appeal,[10] the Appellants contend that common pleas erred because it impermissibly substituted its judgment for that of the ZBA, when the ZBA concluded that Monroe's evidence was not credible and objective and, therefore, insufficient to meet its initial burden of proof. Essentially, the Appellants posit common pleas disagreed with the ZBA's findings on credibility, which is not a basis for overturning the ZBA's determination. The Appellants argue that Montgomery's conclusions about the impact the Project would have on traffic in the area were not credible and the ZBA rightly rejected them. In any case, the Appellants argue, Montgomery's testimony supports the ZBA's decision that the Project "will add an extreme amount of volume to an already congest[ed] and busy intersection of multiple streets." (Appellants' Brief (Br.) at 19.) Further, the Appellants argue, the ZBA's decision that Monroe did not meet its burden "was clearly based on the **credible** and **objective** testimony from the near[by] neighbors" who recounted how the surrounding area is congested, the proposed use presents a danger to parents and children who walk to the nearby charter schools, the prior use of the property as a 7-Eleven was "horrible," and the 18th Street Dunkin' Donuts is a public nuisance. (*Id.* at 16-17 (emphasis in original).) Although Monroe failed to meet its burden, the Appellants continue, they met their burden of proof establishing that the Project was contrary to the health, safety, and welfare of the surrounding community. According to the Appellants, common pleas was wrong to reject the Appellants' evidence as speculative. Rather, the Appellants' evidence, although admittedly consisting of

---

[10] Although the Appellants have presented their argument in three point headings, we have condensed them into one for ease of discussion and clarity.

testimony from lay witnesses, was objective proof of the conditions surrounding the Property because their testimony was based on existing experience.

## III.  Analysis

"A special exception is a conditionally **permitted use**, allowed by the legislature if specifically listed standards are met." *In re Appeal of Brickstone Realty Corp.*, 789 A.2d 333, 340 (Pa. Cmwlth. 2001) (emphasis added).  Thus, "[a] special exception is . . . not an 'exception' to the zoning ordinance, but a use permitted conditionally, the application for which is to be granted or denied by the zoning hearing board pursuant to express standards and criteria." *Id.*

Section 14-303(7)(e) of the Zoning Code sets forth the criteria the ZBA must consider when determining whether to approve an application for a special exception.

> The Zoning Board **must approve, or approve with conditions**, the application for a special exception if it determines that the criteria in § 14-303(7)(e)(.1) and § 14-303(7)(e)(.2) below have been met, unless the Zoning Board finds that the objectors, if any, satisfied the criteria in § 14-303(7)(e)(.3).  The Zoning Board shall, in writing, set forth each required finding for each special exception that is granted, set forth each finding that is not satisfied for each special exception that is denied, and to the extent that a specific finding is not relevant to the decision, shall so state.  The Zoning Board shall file with each decision approving a special exception any Project Information Form prepared by the applicant pursuant to § 18-503, but need not attach the Form to the decision; filing of the Form shall not constitute incorporation of its contents into the decision and those contents shall not be binding.

> (.1)  **Specific Conditions of Use.**
> The applicant shall have the initial duty of presenting evidence, and the burden of proof, that the proposed use meets the definition for a use permitted by special exception, that all dimensional standards are satisfied, and that the application complies with all the criteria and meets all the conditions

applicable to the proposed use, including all applicable use-specific standards in § 14-603 (Use-Specific Standards).

(.2) **Specific Detrimental Impacts on the Neighborhood.** The applicant shall have the initial duty of presenting objective evidence, and the burden of proof, that the grant of a special exception will not cause the following specific detrimental impacts to the neighborhood **beyond that which normally might be expected** from the proposed use:

> (.a) Congestion in the public streets or transportation systems;
> (.b) Overcrowding the land;
> (.c) Impairing an adequate supply of light and air to adjacent property;
> (.d) Burdening water, sewer, school, park, or other public facilities;
> (.e) Impairing or permanently injuring the use of adjacent conforming properties;
> (.f) Endangering the public health or safety by fire or other means; or
> (.g) Inconsistency with the Comprehensive Plan of the City.

(.3) **General Detrimental Impacts on the Neighborhood.** Once the applicant meets such initial duty and burden of proof, the objectors, if any, shall have the duty of presenting objective evidence, and the burden of proof, that the proposed use is substantially likely to cause a detrimental impact on the health, safety, and welfare of the neighborhood exceeding that which normally might be expected from the proposed use. The objectors also may present evidence, and have the burden of proof, that the proposed use fails to conform with the purpose, spirit, and intent of this Zoning Code.

Phila., Pa., Zoning Code § 14-303(7)(e) (2016) (emphasis added).

The Zoning Code, thus, places the initial burden on the applicant to prove that the proposed use meets all of the Zoning Code's criteria and conditions applicable to the proposed use. The applicant also bears the initial burden of proving that the

12

proposed use will not detrimentally impact the neighborhood **beyond what is normally expected from the proposed use** pursuant to seven specific criteria. If the applicant satisfies this initial burden, the objectors, should there be any, have the burden of proving that the proposed use will detrimentally impact the health, safety, and welfare of the neighborhood beyond what is normally expected from the proposed use and may present evidence, and bear the burden of proving, that the proposed use does not conform with the purpose, spirit, and intent of the Zoning Code. In order for the objectors to meet their burden, they cannot merely speculate as to possible harm, but must show "a high degree of probability that the proposed use will substantially affect the health, safety[,] and welfare of the community greater than what is normally expected from that type of use." *Sunnyside Up Corp. v. City of Lancaster Zoning Hearing Bd.*, 739 A.2d 644, 650 (Pa. Cmwlth. 1999) (quotation omitted). The burden placed on the objectors "is a heavy one." *Marr Dev. Mifflinville, LLC v. Mifflin Twp. Zoning Hearing Bd.*, 166 A.3d 479, 483 (Pa. Cmwlth. 2017).

When common pleas takes no additional evidence, our standard of review of the ZBA's denial of a special exception is limited to whether the ZBA abused its discretion or committed an error of law. *In re Appeal of Brickstone Realty Corp.*, 789 A.2d at 338. The ZBA abuses its discretion when it makes material findings of fact not supported by substantial evidence. *Id.* "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Manor Healthcare Corp. v. Lower Moreland Twp. Zoning Hearing Bd.*, 590 A.2d 65, 70 (Pa. Cmwlth. 1991). The ZBA, as fact-finder, determines the credibility of witnesses and the weight afforded to their testimony. *Hawk v. City of*

13

*Pittsburgh Zoning Bd. of Adjustment*, 38 A.3d 1061, 1065 (Pa. Cmwlth. 2012). The ZBA may accept or reject the testimony of a witness in whole or in part. *Id.*

Here, common pleas correctly concluded that the ZBA abused its discretion in denying the Application because there was not substantial evidence in the record to support the ZBA's conclusions of law 8 and 9. First, in conclusion of law 8, the ZBA concluded that Monroe did not satisfy its burden of establishing that the Project will not cause traffic congestion or endanger the health or safety of the public. The proposed use, a take-out restaurant, is permitted by special exception, and therefore it was Monroe's burden to establish that the Dunkin' Donuts would not cause traffic congestion or endanger the health or safety of the public beyond what is normally expected from a take-out restaurant on that site. As common pleas correctly found, there was not substantial evidence to support the ZBA's conclusion, while, to the contrary, there was ample evidence, much of which was unrebutted, to support the opposite result. Specifically, Montgomery, the only expert to testify at the hearing regarding traffic, concluded that the Project **would not** increase traffic congestion. Montgomery's conclusion was based on an analysis that included a manual traffic count, other analyses TPD had conducted in Philadelphia, and his review of an industry manual about the number of customers that could be expected to frequent a coffee/donut shop without a drive-thru window. Montgomery concluded that the highest level of traffic would be in the morning, between 7:30 a.m. to 8:30 a.m., and that 130 customers would visit the Dunkin' Donuts during this hour, 30 of which would be customers who drove there. During this same hour, Montgomery noted, over 1,000 vehicles would be driving along Oregon Avenue past South Carlisle Street. (Transp. Analysis, Fig.3, R.R. at 316a.) Thus, 30 vehicles stopping at the Dunkin' Donuts, many of which, Montgomery stated, would be stopping while en

14

route to another destination, would not, as Montgomery concluded, increase congestion in the public streets.[11]  Based on the foregoing, Monroe met its initial burden of showing that the Project would not cause congestion in the streets or endanger public health or safety **beyond that which normally might be expected from the proposed use**.  *See In re Appeal of Brickstone Realty Corp.*, 789 A.2d at 341 (stating that substantial evidence did not support zoning board's conclusion that a proposed entry and exit would be dangerous to persons using that roadway where the only expert to testify, who was not found incredible, testified to the contrary).

Therefore, the burden shifted to the objectors to show that the Project would detrimentally impact the health, safety, and welfare of the neighborhood **beyond what is normally expected from the proposed use**.  In conclusion of law 9, the ZBA found that the objectors' testimony regarding existing traffic patterns, congestion in the streets, and the proximity of two charter schools and residential uses was sufficient to establish that the Project was substantially likely to cause such a detrimental impact.  However, the objectors' evidence was insufficient to meet their burden of proof.  As common pleas aptly noted, many of the comments from the objectors were speculative.  Comments such as "traffic congestion will increase," the proposed parking lot "is too small for the number of cars that these stores draw," and patrons will try to park two or three cars in a single parking spot, were speculative and unsupported by "objective evidence."  (Hr'g Tr. at 51, 54, R.R. at 63a, 66a); Phila., Pa., Zoning Code § 14-303(7)(e)(.3) (2016); *see Allegheny Tower Assocs., LLC v. City of Scranton Zoning Hearing Bd.*, 152 A.3d 1118, 1126 (Pa.

---

[11] In the Appellants' brief, they argue that Montgomery's conclusion that 75 percent of trips to the Dunkin' Donuts will be non-vehicular is "mind bogglingly high," but the Appellants presented no proof to counter Montgomery's conclusion. (Appellants' Br. at 19.)  Montgomery, however, noted that the Property is located near a bus stop and the Broad Street subway line. (Hr'g Tr. at 33, R.R. at 45a.)

Cmwlth. 2017) (stating that objectors' lay testimony based "solely on their personal opinions, bald assertions and speculation" is insufficient to meet their burden); *In re Appeal of Brickstone Realty Corp.*, 789 A.2d at 342 (stating that in order for protestors to meet their burden, they "were required to produce more than lay expressions of concern for increased traffic in an already busy area").  Many of the objectors complained about the general traffic conditions in the area, with one objector describing it as "horrendous."  (Hr'g Tr. at 60, R.R. at 72a.)  However, "the fact that a proposed use would contribute to projected traffic congestion primarily generated by other resources is not a sufficient basis for denying a special exception." *Manor Healthcare Corp.*, 590 A.2d at 71 (internal quotation marks and citation omitted).[12]  Moreover, even if the objectors had provided objective evidence showing that traffic would increase in already congested streets, this would not suffice to meet their burden.  They had to show a "substantial increase [that] would, by a high degree of probability, pose a substantial threat to the health and safety of the community." *In re Appeal of Brickstone Realty Corp.*, 789 A.2d at 341.  The objectors fell short of meeting their burden.

Furthermore, the presence of two charter schools and residential homes nearby does not, contrary to the ZBA's conclusion, lead to the conclusion that the Project "is substantially likely to cause a detrimental impact on the neighborhood's health, safety and welfare **beyond that which might normally be expected** from a takeout restaurant."  (COL ¶ 9 (emphasis added).)  The mere proximity of the Dunkin' Donuts to two charter schools and residential homes standing alone is insufficient to overcome the presumption "that the local legislature **has already**

---

[12] Some of the objectors' testimony was not relevant to this Project.  One objector testified about the traffic conditions near the 18th Street Dunkin' Donuts at some unspecified time in the past when she "used to work at the University of Penn." (Hr'g Tr. at 59, R.R. at 71a.)

16

**considered that such use satisfies local concerns** for the general health, safety, and welfare." *In re Appeal of Brickstone Realty Corp.*, 789 A.2d at 340 (emphasis added); *see Allegheny Tower Assocs.*, 152 A.3d at 1125 (stating that "'[p]roof that goes no further than to establish (for example) that there are residences close to a proposed gasoline station is insufficient, for to permit a denial on that basis would be to overrule the legislative judgment reflected in zoning'") (quoting Robert S. Ryan, Pennsylvania Zoning Law & Practice, § 5.3.4 (rev. 2003)).

While the Appellants also point to the operation of the 18th Street Dunkin' Donuts as proof foreshadowing the detrimental impact that the Project will have on the area, the ZBA did not reach such a conclusion. Unlike with the neighboring charter schools and residential homes, the ZBA did not mention the 18th Street Dunkin' Donuts in its conclusions of law.[13]

In short, there was not substantial evidence in the record by which the ZBA could have been "persuaded" that the Project "is substantially likely to cause a detrimental impact on the neighborhood's health, safety and welfare beyond that which might normally be expected from a takeout restaurant." (COL ¶ 9.) Thus, contrary to the Appellants' contention, common pleas did not substitute its judgment for that of the ZBA but, here, the only evidence in the record supported granting the special exception. *See Lamar Advert. of Penn, LLC v. Zoning Hearing Bd. of Borough of Deer Lake*, 915 A.2d 705, 709 n.9 (Pa. Cmwlth. 2007) (noting that in reviewing a decision of a zoning hearing board, "a court may not substitute its judgment for that of the board; and, assuming the record demonstrates substantial

---

[13] The Appellants also point to the prior use of the Property as a 7-Eleven, which, in the words of one objector, was "horrible." (Hr'g Tr. at 61, R.R. at 73a.) However, there was little elaboration about how the use of the Property as a 7-Eleven made the area "horrible" other than there were "[b]eggers" in the area. (Hr'g Tr. at 64, R.R. at 76a.)

17

evidence, the court is bound by the board's findings which result from resolutions of credibility and the weighing of evidence rather than a capricious disregard for the evidence") (citation omitted). While we understand that the testifying neighbors do not want the Dunkin' Donuts in their neighborhood, and are concerned about increased traffic and congestion, a take-out restaurant is permitted on the Property as a special exception. Thus, they had to demonstrate that this take-out restaurant would detrimentally impact the neighborhood beyond that which would normally be expected from a take-out restaurant on this site. This they did not do. As such, common pleas correctly concluded that the ZBA abused its discretion in denying Monroe's Application for a special exception, and we affirm the Order.

_____
**RENÉE COHN JUBELIRER,** Judge


Judge Fizzano Cannon did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Monroe Land Investments | : | |
| | : | |
| v. | : | No. 571 C.D. 2017 |
| | : | |
| Zoning Board of Adjustment and The City of Philadelphia and Broad Street West Civic Assoc. and John Furey | : : : | |
| | : | |
| Appeal of: John Furey and Broad Street West Civic Assoc. | : : | |

# **O R D E R**

    **NOW**, March 26, 2018, the March 28, 2017 Order of the Court of Common Pleas of Philadelphia County, in the above-captioned matter, is hereby **AFFIRMED**.

 

 

_____

**RENÉE COHN JUBELIRER,** Judge