# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Metal Green Inc. and    :
NOA Properties Inc.     :
             :
     v.      :  No. 373 C.D. 2019
             :  Argued: June 9, 2020
City of Philadelphia and    :
City of Philadelphia Zoning   :
Board of Adjustment and    :
Wickham Kraemer III and    :
Mary Kraemer, husband and wife :
             :
Appeal of: Wickham Kraemer III :
and Mary Kraemer     :


**BEFORE: HONORABLE P. KEVIN BROBSON, Judge**
      **HONORABLE PATRICIA A. McCULLOUGH, Judge**
      **HONORABLE J. ANDREW CROMPTON, Judge**


**OPINION BY JUDGE BROBSON  FILED: July 28, 2020**


Wickham Kraemer III and Mary Kraemer (Appellants) appeal from an order of the Court of Common Pleas of Philadelphia County (common pleas), dated February 25, 2019. Common pleas reversed the decision of the Zoning Board of Adjustment of the City of Philadelphia (Board), which denied the application of Metal Green Inc. (Owner)[1] for a use variance. For the reasons discussed below, we reverse common pleas' order.

---

[1] By order dated December 12, 2019, this Court precluded the City of Philadelphia (City), also a party to this case, from filing briefs in this matter due to its failure to conform to this Court's earlier order directing it to do so.

## I. BACKGROUND

This matter concerns Owner's property at 6800 Quincy Street in the City of Philadelphia (Property). The Property consists of roughly one-third of an acre (14,222 square feet) and contains a two-story industrial building of approximately 23,000 square feet (Building), which has been unused for many years. Owner purchased the Property at a sheriff's sale in 2013 and did not immediately begin work on the Building. In August of 2016, Mt. Airy USA, a local nonprofit, initiated legal action against Owner concerning the Property pursuant to the Abandoned and Blighted Property Conservatorship Act,[2] commonly known as Act 135. In the Act 135 proceedings, common pleas declared the Property to be blighted and abandoned and ordered Owner to remediate the hazards the Property posed to the community. Although it has the authority to order demolition pursuant to Section 6(c) of Act 135, 68 P.S. § 1106(c), common pleas allowed Owner to make repairs to the Building and to pursue redevelopment of the Property.

The Property is located in the City's residential two-family attached zoning district (RTA-1 district), which, under the Philadelphia Zoning Code (Code), permits duplex residences as of right. Owner, together with NOA Properties,[3] the equitable owner of the Property at that time, decided to pursue redevelopment of the Building as an 18-unit apartment complex with 19 indoor parking spaces.[4] NOA Properties applied for the required building permit with the City's Department of Licenses and Inspections (L&I), but L&I denied the permit application because the proposed

---

[2] Act of November 26, 2008, P.L. 1672, *as amended*, 68 P.S. §§ 1101-1111.

[3] NOA Properties has since ceased to have an equitable interest in the Property. Owner pursued the variance before the Board from the time of the hearing onward and continues this appeal as the legal owner of the Property.

[4] Owner's initial development proposal called for 21 dwelling units, but Owner subsequently reduced the number of units to 18.

multifamily use is not permitted in the RTA-1 district. NOA Properties then appealed L&I's decision to the Board, seeking a use variance to allow conversion of the Building into an 18-unit apartment building with 19 indoor parking spaces. The Board scheduled a hearing on the variance request.

At the hearing on September 19, 2017, Owner first presented the testimony of David Polatnick, a licensed architect employed by Owner. Mr. Polatnick described Owner's proposed conversion of the Building into apartment units and indoor parking spaces, which, he emphasized, would occur without modification to the existing dimensions of the Building. He testified that, unless the Building is demolished, the Property cannot comply with the RTA-1 district's open space and setback requirements. He also explained that, because of the Property's limited street frontage, Owner could not construct any more than one single-family home on the Property in a manner that complies with the Code. Mr. Polatnick added that, in his professional opinion, Owner's proposal would increase the safety of the Property and its surroundings by incorporating updated fire suppression and structural components into the Building. On cross-examination, Mr. Polatnick admitted that nothing would prevent Owner from demolishing the Building.

Owner then presented the testimony of Andrew Miller, Esq., the attorney then representing Owner in the Act 135 proceeding concerning the Property. Mr. Miller testified that, following common pleas' determination that the Property was blighted, Owner undertook repairs to the roof and one wall of the Building. Mr. Miller also explained that a hearing was scheduled for that same day before common pleas regarding the status of Owner's blight remediation efforts.

Owner next presented the testimony of George Ritter, a licensed landscape architect and professional planner. Owner employed Mr. Ritter to evaluate the

3

characteristics of the neighborhood surrounding the Property and opine as to how Owner's proposal would fit into those characteristics. Mr. Ritter described the immediate neighborhood as consisting of single-family detached homes, semi-detached homes, multistory apartment buildings, and commercial uses, which are spread across a variety of residential zoning districts ranging from RSD-3 (detached single family) to RM-3 (multifamily). Mr. Ritter explained that, of the nine nearby duplex homes within the RTA-1 district, seven have been converted (through variance relief) into multifamily structures with up to six units in one building.

Mr. Ritter further testified that, based upon his review of property records and field observations in the neighborhood, the nearby properties in the RTA-1 district include a total of 40 dwelling units, equivalent to an average density of 62 units per acre of property area. He also stated that the adjacent multistory apartment buildings—which are located in a multifamily district permitting greater density— average a density of 143 units per acre. Mr. Ritter opined that Owner's proposed use of the Property would have a density of about 55 units per acre—a lower density than both the adjacent multistory apartments and the other properties located in the RTA-1 district. He also observed that all of the other properties in the RTA-1 district rely on street parking only, whereas Owner's proposal will provide additional parking in compliance with the Code's requirements.

Concerning compatibility with the neighborhood, Mr. Ritter emphasized that the renovations required for Owner's proposal would be principally internal to the Building and that the dwelling units themselves would be located on the second floor of the Building with no ground-level view into the rear yards of adjacent properties. When asked whether Owner's proposal would "change . . . the essential character of

4

[the] neighborhood," Mr. Ritter responded that, in his opinion, Owner's proposal "could only improve the character of the neighborhood" and "would actually help . . . the value of the neighborhood, as compared to where it was headed." (Reproduced Record (R.R.) at 99a.) He further opined that, because the Building already exists as a nonconforming use, the proposed renovation would (as opposed to demolition) "have no detrimental effect" on the immediate area. (*Id.* at 101a.)

Mr. Ritter further testified that, because of the size of the adjacent multistory buildings, a single-family home constructed in the Building's place would be "difficult" to market. (*Id.* at 102a.) When asked whether he thought Owner's proposal of 18 units "rang[ing] from 800 to 1,000 [square] feet" would be an "overuse of the [P]roperty," Mr. Ritter responded, "I do not." (*Id.* at 106a.) Mr. Ritter concluded with his opinion that Owner's proposal is "a very good adaptive reuse of [the B]uilding" which is "appropriate for the neighborhood," will not change the character of the neighborhood, and "will bring [the B]uilding back . . . [as] a usable, functional structure in the community." (*Id.* at 107a.)

On cross-examination, Mr. Ritter admitted that, in reviewing potential plans for redeveloping the Property, he did not consider alternatives to Owner's proposal other than demolition and construction of single-family homes. When asked whether "18 units is not necessarily the . . . least minimum variance required for [the P]roperty," Mr. Ritter answered: "I believe this is the least that should be considered, given . . . that the [Building] is there and . . . it's being renovated." (*Id.* at 121a.)

After Mr. Ritter's testimony, Ralph Pinkus, chairman of the West Mount Airy Neighbors Zoning Committee (a registered community organization, or RCO, in the area), testified. Mr. Pinkus summarized the contents of the letter that the RCO sent to the Board in opposition to Owner's proposal. He described a meeting of the RCO

5

that was held on September 6, 2017, at which all 21 people in attendance voted to oppose Owner's proposal. Mr. Pinkus shared the RCO's belief that "this proposal will . . . result in overcrowding in the neighborhood" and that Owner has made no effort to discuss RCO members' objections to the proposal. (*Id.* at 126a-27a.)

Owner then continued to present evidence, calling Frank Montgomery, a licensed professional traffic operations engineer who conducted a transportation study of the Property and its surroundings. Mr. Montgomery testified that the surrounding intersections have "significant capacity" to absorb the additional trips that would result from Owner's proposal and that the proposal would not "present[] a challenge or a stress on the local road." (*Id.* at 136a-38a.) He also gave his opinion that the parking impact of Owner's proposal was significantly reduced by the interior parking to be available to residents. Mr. Montgomery summarized his testimony by stating that, in his opinion, Owner's proposal would not negatively affect transportation in the area and any traffic impacts would not alter the essential character of the neighborhood.

Owner next presented the testimony of its president, Jack Azran. Mr. Azran described Owner's purchase of the Property and its efforts to remediate hazards pursuant to the Act 135 proceeding. He also described prior owners' attempts to secure variance relief for the Property. Mr. Azran gave his opinion, as an experienced builder, that the Building is too large to be used as a single- or dual-family dwelling.

Finally, Owner presented the testimony of Jack Coyle, a certified real estate broker and appraiser. Mr. Coyle described his review of the area's zoning and market characteristics, and he observed that most of the properties in the area are not in strict compliance with the Code. He opined that it is not economically feasible to

6

use the Building for industrial or commercial purposes because of limited truck access and low surrounding density. Mr. Coyle also opined that Owner's proposal "would enhance the character of the neighborhood." (*Id.* at 198a.)

On cross-examination, Mr. Coyle confirmed that Owner's proposal for 18 units is, in his opinion, the least variance that would make the Building usable. Specifically, he stated that the number of units that would take full advantage of the Building as it exists now "approaches . . . 18," and that he "wouldn't [start] out thinking about feasibility with 10 or 12 or 14 units." (*Id.* at 207a.) On re-direct examination, Mr. Coyle explained that, compared to the rental rate per square foot in competing buildings in the area, the size of the 18 requested units is "right in the wheel[]house of the market." (*Id.* at 217a-18a.) He confirmed that, in his opinion, the requested variance for 18 units is "the least minimum [variance that would] . . . afford relief for [Owner]." (*Id.* at 218a.)

Appellants presented the testimony of several witnesses in opposition to Owner's proposal. First, Wickham Kraemer III, who owns a single-family home adjacent to the Property, described the neighborhood as beautiful, historic, and vibrant, with monthly neighborhood parties and a family-friendly atmosphere. He acknowledged the more dense character of the two multistory apartment complexes nearby, but also clarified that the greater density is concentrated in the immediate area of those complexes, which do not greatly affect the character of the single-family homes in the area. Mr. Kraemer stated that no representative of Owner has approached him to discuss the proposed renovation. While open to discussing the project, Mr. Kraemer stated that he "would like . . . something less dense, that would conform with the neighborhood, . . . have an open area, have families move

7

in, just like the rest of the area." (*Id.* at 229a.) He confirmed that he is "looking for a lesser variance to be granted." (*Id.* at 229a-30a.)

Mr. Kraemer also described specific concerns he had over increasing density, including increased traffic and sound pollution. He offered his lay opinion that building fewer, larger units in the Building at a higher price point would be viable in the local market and might attract more families to the area, which is his preference. In conclusion, he stated that Owner's proposal would "very much" negatively affect his and his family's way of life and the character of the community. (*Id.* at 234a.)

Appellants next presented testimony by several neighborhood residents in opposition to Owner's proposal. Colleen Floyd-Carrol testified that the two multistory apartment buildings in the neighborhood are senior housing, which, in her view, mitigates the effect of their density upon the community. She also stated that she has spoken with other developers that were interested in developing the Building in a less dense way and reiterated that, in her opinion, a less dense renovation would be "much more appropriate . . . [for] the neighborhood." (*Id.* at 243a.)

Jon Farnham, another neighborhood resident, testified that he was "opposed to the density" of Owner's proposal. (*Id.* at 247a.) He disagreed with any suggestion that the neighborhood is moving toward greater density and explained that he and many of his neighbors have converted unpermitted two-family dwellings back into conforming single-family dwellings. He described how, in the last 15 years, the neighborhood has benefited by increasing investment, which has returned dilapidated single-family homes to productive use. He characterized the neighborhood as consisting of "single-family detached and semi-detached houses with a couple of anomalies that are adjacent to [the P]roperty." (*Id.* at 248a.) After

8

stating his opinion that "this project would be detrimental to the public welfare," Mr. Farnham explained that he and his neighbors are "not opposed to development. It's just that the number 18 strikes us as too great. And I think [it] will change the character of the neighborhood." (*Id.* at 249a-50a.)

Louis Antonio Colon testified that he is concerned about the parking effects of Owner's proposal, given that parking is already sometimes difficult to find in the neighborhood. Like other community members, he expressed his preference for a less dense development of "four to six condos," which, he opined, would "bring the property value up" and "make it look nice." (*Id.* at 254a-55a.) Eric Carbone testified that he opposed Owner's proposal "based on density and the fact that [the units] are going to be rental units." (*Id.* at 257a.) He expressed his preference for condominium units that would produce "[s]ome kind of investment in the neighborhood." (*Id.*) Marlene Patterson, another resident, testified that she is "opposed to the density" of the project and that owner-occupied homes or condominiums would better "support the stability of the neighborhood." (*Id.* at 258a.) She clarified that, although she does not oppose developing the Property in general, the proposed density "would impact the quality of life." (*Id.* at 259a.) Austin Edwards testified that he, like his neighbors, is concerned about the potential parking impacts of Owner's proposal. Finally, Mary Kraemer adopted the testimony of her husband, Wickham Kraemer III (discussed above), and added her own testimony that the existing neighborhood has "plenty of life" without Owner's proposal. (*Id.* at 263a.)

On December 19, 2017, the Board issued an order denying Owner's request for a variance. To reach that result, the Board made factual findings in the nature of

9

a summary of the testimony offered at the hearing. Specifically, the Board made the following relevant finding of fact regarding Mr. Ritter's testimony:

> 24. When [Appellants' counsel] asked whether "18 units is not necessarily the least amount of variance . . . that's required for that property[,]" Mr. Ritter said "[t]he choice that's being asked is to tear down the existing structure, abandon its use, and rebuild it . . . . [T]his is the least that should be considered[,] given the fact that the structure is there [and] . . . that it's being renovated. [A]nd the hope is to retain it."

(Board's Decision at 4 (quoting R.R. at 121a).) The Board then made the following relevant conclusions of law:

> 1. . . . . The proposed conversion of the [Building] . . . requires a use variance.
>
> 2. In order to grant a variance, the Board must determine that each of the criteria set forth at . . . Section 14-303(8)(e)(.1) [of the Code] are met. These include:
>
>     (a) that denial of a variance would result in unnecessary hardship;
>
>     . . . .
>
>     (c) that the requested variance is the minimum variance necessary to afford relief and the least modification possible of the regulation in issue . . . .
>
> . . . .
>
> 4. Under . . . Section 14-303(8)(e)(.2) [of the Code], for the Board to find unnecessary hardship . . . , it must make all of the following additional findings:
>
>     . . . .
>
>     (c) [t]hat the use variance, if granted, will not alter the essential character of the neighborhood . . . nor substantially or permanently impair the appropriate use or development of the adjacent property, nor be detrimental to the public welfare. . . .

10

. . . .

8. The Board concludes that [Owner] here did not establish entitlement to the requested use variance.

9. Although the Property is an irregularly shaped lot improved with an existing structure, [Owner] *did not establish* that the requested variance represents the least minimum variance necessary to afford relief. It specifically *did not establish* that conversion to a less dense use, with fewer units, was not possible.

10. [Owner] additionally failed to establish that the proposed use would not negatively impact the public health, safety or welfare.

(*Id.* at 7-9 (emphasis added).)

Owner appealed the Board's decision to common pleas. By order dated February 25, 2019, common pleas reversed the Board's decision and granted the requested variance. In its Pa. R.A.P. 1925(a) opinion, common pleas first reasoned that, based on the decisions of this Court, the Board erred in requiring Owner to demonstrate that the requested variance was the minimum variance necessary to afford relief. In the alternative, common pleas reasoned that "[Owner] presented sufficient evidence and testimony before the [Board]" to meet that standard. (R.R. at 445a.) Specifically, common pleas noted testimony that the proposed 18-unit use would be "less dense than the adjacent . . . dwellings" and that "any less[-]dense use of the Property would require demolishing the [Building]." (*Id.*) Appellants now appeal to this Court.

## II. ISSUES ON APPEAL

On appeal,[5] Appellants raise three issues for our consideration. First, Appellants argue that, despite common pleas' contrary conclusion, the Board did not

---

[5] "Where a trial court takes no additional evidence in an appeal from a decision of the Board, this Court is limited to considering whether the Board erred as a matter of law or abused its discretion." *German v. Zoning Bd. of Adjustment*, 41 A.3d 947, 949 n.1 (Pa. Cmwlth. 2012).

11

err when it determined that Owner must satisfy the "least minimum variance" standard in order to obtain variance relief. Second, Appellants argue that the Board properly concluded that Owner failed to establish that the requested variance represents the minimum variance necessary to afford relief. Third, Appellants contend that the Board's conclusion that Owner failed to demonstrate that the proposed variance would not have an adverse effect on the community prevents issuance of the variance under the Code.

In response, Owner generally argues that the Board erred in failing to consider the Property's blighted nature when it denied Owner's variance request. Specifically, although Owner concedes that the minimum variance standard applies to its variance request, Owner asserts that the Board should have applied the standard differently to the Property because it is blighted and that Owner offered sufficient evidence to satisfy the standard. Owner also argues that the Board erred in concluding that Owner's proposed redevelopment of the Property would negatively affect the public welfare.

## III. DISCUSSION

"A variance is a departure from the exact provisions of a zoning ordinance," and "[t]he party seeking the variance must show substantial, serious, and compelling reasons for the variance request." *S. Broad St. Neighborhood Ass'n v. Zoning Bd. of Adjustment*, 208 A.3d 539, 547 (Pa. Cmwlth. 2019). "When an applicant seeks a variance for a property located in Philadelphia, the Board must . . . consider the factors set forth in the [Code]." *Singer v. Phila. Zoning Bd. of Adjustment*, 29 A.3d 144, 148 (Pa. Cmwlth. 2011). Section 14-303(8)(e)(.1)(.b) of the Code requires that, before granting any type of variance, the Board must determine that "[t]he variance, *whether use or dimensional*, if authorized will represent the

12

minimum variance that will afford relief and will represent the least modification possible of the *use or dimensional* regulation at issue [(Minimum Variance Test)]." (Emphasis added.) Section 14-303(8)(e)(.2)(.c) of the Code requires that, in order to grant a use variance like the one at issue here, the Board must also determine that "the use variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare." Thus, if the criteria in any one section of the Code are not met, the Board must deny the requested variance, regardless of whether other variance criteria are satisfied.

The Board abuses its discretion "only if its findings are not supported by substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, 462 A.2d 637, 640 (Pa. 1983). The Board, as the ultimate factfinder, "determines the credibility of witnesses and the weight afforded to their testimony" and "may accept or reject the testimony of a witness in whole or in part." *Monroe Land Invs. v. Zoning Bd. of Adjustment*, 182 A.3d 1, 9 (Pa. Cmwlth. 2018). An appellate court errs when it substitutes its judgment on the merits for that of the Board. *Marshall v. City of Phila.*, 97 A.3d 323, 331 (Pa. 2014). We have described our deferential standard of review as follows:

> When performing a substantial evidence analysis, we must view the evidence in the light most favorable to the party that prevailed before the fact[]finder. It is irrelevant whether the record contains evidence to support findings other than those made by the fact finder; the critical inquiry is whether there is evidence to support the findings actually made.

13

*Renaissance Real Estate Holdings, L.P. v. Phila. Zoning Bd. of Adjustment*, 199 A.3d 977, 983 (Pa. Cmwlth. 2018) (citations omitted).

We first consider whether the Board correctly concluded that Owner failed to meet the Minimum Variance Test. Regarding this issue, Appellants emphasize that, despite past holdings of this Court under earlier versions of the Code, the current version of the Code, as amended, clearly requires application of the Minimum Variance Test to both use and dimensional variances. Appellants then claim that the record contains "no testimony relating to [Owner's] ability to build fewer than [18] units." (Appellants' Br. at 37.) They argue that common pleas erred when it searched the record for evidence undermining, rather than supporting, the Board's decision, and substituted its judgment for that of the Board in concluding that Owner satisfied the Minimum Variance Test.

In response, Owner first concedes that, under the Code as presently constituted, "the . . . [M]inimum [V]ariance [T]est *does* apply to a use variance." (Owner's Br. at 66.) Owner goes on, however, to argue that, under our decision in *Liberties Lofts LLC v. Zoning Board of Adjustment*, 182 A.3d 513 (Pa. Cmwlth. 2018), the Minimum Variance Test should apply differently to blighted properties. Owner also relies on language in *Liberties Lofts* suggesting that the Minimum Variance Test applies differently or to a lesser extent to use variances (as compared to dimensional variances). Finally, Owner claims that it provided adequate testimonial evidence to satisfy the Minimum Variance Test and the Board articulated no basis for its conclusion that Owner did not make that showing.

The parties are correct that, in its current form, Section 14-303(8)(e)(.1)(.b) of the Code applies the Minimum Variance Test to both use and dimensional variances. This is because, in 2013—one year after the City repealed its former zoning

14

ordinance and replaced it with the Code[6]—the City amended Section 14-303(8)(e)(.1)(.b) to add the words "whether use or dimensional" and "use or dimensional" as they now appear in that section.[7] Even under the City's former zoning ordinance, which did not contain an explicit variance minimization requirement, the Pennsylvania Supreme Court had long held that, "boiled down," the applicable variance criteria essentially implied such a requirement. *Marshall*, 97 A.3d at 329.

We had held, however, that the earlier, implicit minimization requirement "pertain[ed] more to dimensional variance requests [than to use variance requests]." *S. of S. St. Neighborhood Ass'n v. Phila. Zoning Bd. of Adjustment*, 54 A.3d 115, 124 (Pa. Cmwlth. 2012) (*SOSSNA*), *appeal dismissed as improvidently granted*, 97 A.3d 1200 (Pa. 2014). In *SOSSNA*, we reasoned by analogy to the Pennsylvania Municipalities Planning Code,[8] which requires consideration of minimization only when it is "relevant." *Id.* We concluded that, although the minimization requirement is clearly relevant for dimensional variances, in the use variance context, other variance criteria sufficiently constrain the Board's discretion. We also observed that we could identify no cases where a minimization requirement was applied in the context of a pure use variance. Accordingly, we concluded that, under the City's prior zoning ordinance, no minimization requirement applied to a pure use variance application.

---

[6] *See Marshall*, 97 A.3d at 326 n.2 (discussing repeal and replacement).

[7] Bill No. 130725, enacted November 21, 2013, effective December 4, 2013, *available at* https://phila.legistar.com/LegislationDetail.aspx?ID=1490416&GUID=1DA675CD-CE51-42AB-B523-B930544396A9&Options=ID|Text|&Search=130725 (last visited July 22, 2020).

[8] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202.

15

Thereafter, we decided *Liberties Lofts*, which addressed a use variance application made under the current Code as amended in 2013. There, the objector to the requested variance cited a line of cases requiring a developer to show that it could not viably build fewer than the proposed number of units. But the objector did not acknowledge our holding in *SOSSNA* or offer any basis on which to distinguish that case. *Liberties Lofts*, 182 A.3d at 538. We observed that the cases the objector cited all dealt with either dimensional variances or failure to prove unnecessary hardship. Then, without acknowledging the 2013 amendment to the Code, we quoted at length from our discussion in *SOSSNA*, including our conclusion that the minimization requirement does not apply to use variances. *Id.* Ultimately, however, we based our decision on a different rationale—that the developer had satisfied the requirement anyway: "*In any event*, the [zoning board] here determined: 'Applicant presented evidence . . . sufficient to establish that . . . the requested variance is the least necessary to afford relief.' As explained above, the record supports the [Board]'s determination. Thus, *to the extent the minimization requirement is present in this context*, Applicant satisfied it." *Id.* at 538-39 (emphasis added) (citation omitted).

Here, we face the opposite conclusion by the Board: that Owner did *not* show satisfaction of the minimization requirement. Thus, we distinguish *Liberties Lofts* because, in that case, our discussion of the application of the minimization requirement was not dispositive—we would have upheld the variance *even if* we had concluded that the minimization requirement applied. In addition, we note that here, and unlike the parties in *Liberties Lofts*, Appellants offer a compelling reason for departing from the reasoning in *SOSSNA* on which we relied in *Liberties Lofts*: *i.e.*, the 2013 amendment, the sole purpose of which was to clarify that the Minimum

16

Variance Test applies with equal force to use and dimensional variances. Given this analysis, we disagree with Owner's suggestion that our decision in *Liberties Lofts* somehow modified or limited the Minimum Variance Test with respect to use variances requested under the current Code. For the same reason, we are not persuaded that the blighted nature of the property at issue in *Liberties Lofts* implies that blighted properties are subject to a different version of the Minimum Variance Test.[9] We conclude, therefore, that the Minimum Variance Test under Section 14-303(8)(e)(.1)(.b) of the Code applies to pure use variance applications such as the one at issue here.

Regarding the Minimum Variance Test, the Board concluded that Owner "did not establish" that conversion to a smaller number of units was not possible. (Board's Decision at 9.) In so concluding, the Board did not expressly state whether Owner failed in (1) its burden of *production* (*i.e.*, failed to provide sufficient evidence to allow the Board to rule in its favor), or (2) its burden to *persuade* the Board to credit and rely upon Owner's evidence and rule in Owner's favor.[10] Based upon the nature of the testimony before the Board, it appears that, although that testimony might have been sufficient to *allow* the Board to rule in Owner's favor, the Board chose not to credit and/or weigh that evidence in Owner's favor.

---

[9] Neither our Supreme Court in *Marshall* nor this Court in *Liberties Lofts* made any explicit connection between the property's blighted nature and whether the requested variance was the minimum relief necessary. Owner asserts such a connection and cites those cases in support, but Owner does not articulate why such a connection is required under the Code.

[10] "The burden of proof actually includes two different burdens: the burden of production, where the burdened party must produce enough evidence to avoid an adverse legal ruling, and the burden of persuasion, where the burdened party must convince the fact finder to the required degree of certainty of the party's position on that issue." *Topps Chewing Gum v. Workers' Comp. Appeal Bd. (Wickizer)*, 710 A.2d 1256, 1261 n.16 (Pa. Cmwlth. 1998) (internal quotation marks omitted).

17

In its finding of fact regarding Mr. Ritter's testimony about the Minimum Variance Test, the Board noted his statement that 18 units "is the least that should be considered" because the Building already exists and the alternative to development would be to demolish the Building. (*Id.* at 4 (quoting R.R. at 121a).) On one hand, the statement suggests that an approval of fewer units would not remedy the hardship and would result in Owner choosing to demolish the Building instead. On the other hand, that statement could simply be an expression of Owner's preference for the proposed layout, and it does not explain *why* the existing Building could not viably support fewer units.

Mr. Ritter explained that the requested 18 units—ranging from 800 to 1,000 square feet—would not be an "overuse" of the Property. (R.R. at 106a.) He did not, however, explain whether 18 units is the *minimum* viable use of the Property, nor did he give reasons for his belief that 18 units is not an "overuse." Mr. Coyle stated that, in order to "take advantage of what's there"—*i.e.*, the existing Building—the "feasib[le]" number of units "*approaches* . . . 18," and that he "wouldn't [start] out thinking about . . . 10 or 12 or 14 units." (*Id.* at 207a (emphasis added).) But he did not expressly discuss whether "10 or 12 or 14" units would be a *viable* (although less profitable) course, and he did not consider a project with a marginally smaller number of units—17, for example, or 16.

The Board, as factfinder, apparently declined to credit and/or weigh this testimony in Owner's favor. Although the Board did not make the credibility and weight determinations explicit, its conclusion that Owner "did not *establish*" satisfaction of the Minimum Variance Test fairly encapsulates those implicit determinations. (Board's Decision at 9.) We are not in a position to second-guess those determinations or substitute our own judgment for that of the Board.

18

*See Marshall*, 97 A.3d at 331. Thus, viewing the evidence before the Board in the light most favorable to Appellants, as we must, we conclude that the Board did not abuse its discretion in concluding that Owner did not establish satisfaction of the Minimum Variance Test.

## IV. CONCLUSION

Because the Board did not err or abuse its discretion in concluding that Owner failed to demonstrate satisfaction of the Minimum Variance Test, Owner is not entitled to the requested variance. Common pleas, therefore, erred in reversing the Board's decision and granting the variance.[11] Accordingly, we will reverse the decision of common pleas.

P. KEVIN BROBSON, Judge

---

[11] Given this conclusion, we need not address Appellants' remaining arguments on appeal.

19

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Metal Green Inc. and : 
NOA Properties Inc. : 
                     : 
         v. :    No. 373 C.D. 2019
                     : 
City of Philadelphia and : 
City of Philadelphia Zoning : 
Board of Adjustment and : 
Wickham Kraemer III and : 
Mary Kraemer, husband and wife : 
                     : 
Appeal of: Wickham Kraemer III : 
and Mary Kraemer : 

# **O R D E R**

AND NOW, this 28th day of July, 2020, the order of the Court of Common Pleas of Philadelphia County, dated February 25, 2019, is REVERSED.

_____
P. KEVIN BROBSON, Judge
