IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Cogan Properties, LLC, : 
                         Appellant : 
                               : 
                  v. : 
East Union Township Zoning Hearing : 
Board, Eagle Rock Community : 
Association, Inc., and Eagle Rock :    No. 619 C.D. 2023 
Resort, Co. :    Argued: May 7, 2024

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge
                  HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION
BY JUDGE FIZZANO CANNON                      FILED: June 12, 2024

        Cogan Properties, LLC (Applicant) appeals from the May 31, 2023 Order (Trial Court Order) of the Court of Common Pleas of Schuylkill County (Trial Court) that affirmed the decision of the East Union Township Zoning Hearing Board (Board) denying a special exception for a private recreational facility on Applicant's property. Upon review, we affirm the Trial Court Order.

## I. Background and Procedural Posture

        In June of 2022, Applicant filed a special exception use application (Application) with East Union Township (Township) pursuant to Township's Zoning Ordinance[1] (Ordinance) seeking permission to operate a private recreational

---

[1] East Union Township 2009 Zoning Ordinance, *as amended* (Ordinance) (2021); Reproduced Record (R.R.) at 608a-868a.

facility in the form of a gun range on a 526-acre property (Property)[2] located in Township's CR Conservation Residential zoning district (CR District). *See* Application, Reproduced Record (R.R.) at 77a-87a. Although not a permitted use,[3]

_____

[2] The Property consists of Township UPI Nos. 09-05-0002.005, 09-05-0001.003, and 09-0001.001. *See* R.R. at 82a. Applicant is an equitable owner of the Property, having contracted to purchase the same subject to approval of the instant Application. *See* R.R. at 78a & 109a-22a.

[3] Permitted uses in the CR District include:

- Agriculture, []
- Animal Hospitals
- Accessory Solar Energy System
- Bed and Breakfast Establishments
- Cemeteries
- Club/Private Lodge
- Communication antennas mounted on an existing public utility transmission tower, building or other structure
- Commercial Greenhouses, Nurseries, and Garden Shops
- Crop Farming
- Emergency Services Facility
- Essential Public Utility Facility . . . (excluding storage yards)
- Forestry []
- Golf Courses
- Group Residence
- Home Occupations
- Home Office
- No Impact Home[-]Based Business
- Nursing Homes
- Outdoor Fuel Burning Furnace []
- Place of Worship
- Personal Services
- Public Recreational Facilities
- Public Uses
- Non-Commercial Windmill
- Single-Family Detached Dwellings
- Stables (Private) in association with a single[-]family dwelling or farm
- Tree Farm []
- Wildlife Refuge
- Accessory Uses to the Above

private recreation facilities are permitted by special exception within Township's CR District.[4]

Township denied the Application and Applicant appealed to the Board. *See* Appeal Application dated June 21, 2022 (Appeal), R.R. at 88a-93a. The Board conducted hearings on the Appeal on August 18, 2022, and September 22, 2022. *See* Notes of Testimony, August 18, 2022 & September 22, 2022 (collectively, N.T.[5]), R.R. at 245a-496a. At the conclusion of the hearing, the Board unanimously voted to deny the Application. *See* N.T. at 249, R.R. at 494a. In a written decision issued on November 1, 2022, the Board explained that Applicant failed to comply with the requirements of Ordinance Sections 1510.2. *See* Decision of the East Union Township Zoning Hearing Board issued November 1, 2022 (Board Decision), R.R. at 500a-34a.

Applicant timely appealed to the Trial Court. *See* R.R. at 869a-917a. Without taking further evidence, the Trial Court issued the Trial Court Order on May 31, 2023, disagreeing with the Board's evidentiary determinations but ultimately affirming the Board Decision as to Ordinance Section 1510.2(5), which requires a

Ordinance, Section 502.1, R.R. at 676a.

[4] Uses permitted by special exception in the CR District include:

- Private Recreation Facilities
- School, Public or Private, Primary or Secondary
- Accessory Uses to the Above

Ordinance, Section 502.2, R.R. at 676a.

[5] The Notes of Testimony from the August 18, 2022 portion of the Board hearing and the September 22, 2022 portion of the hearing, although occurring on different dates, are numbered consecutively as a continuation of the same hearing. *See* N.T. at 1-251, R.R. at 245a-496a.

proposed use in a special exception application to be compatible with the adjoining development and the character of the zoning district and neighborhood in which it is to be located. *See* Trial Court Order, R.R. at 593a-606a; *see also* Ordinance, Section 1510.2(5), R.R. at 840a. Applicant thereafter timely appealed to this Court.[6]

## II. Issues

On appeal,[7] Applicant argues that the Trial Court abused its discretion or erred as a matter of law by affirming the Board's conclusion that the proposed recreational facility was incompatible with the character of the zoning district and the neighborhood as required by Ordinance Section 1510.2(5), which Applicant argues is not a specific, objective criterion of the Ordinance and not Applicant's burden to prove. *See* Applicant's Br. at 5, 18-27. Applicant also argues that the neighbors who objected to the proposed recreational facility (collectively, Objectors) failed to carry their heavy burden to rebut the presumption that the proposed use is consistent with the health, safety, and welfare of the community. *See id.*

The Board counters that the determination of whether a proposed special exception is compatible with adjoining development and the character of the zoning district and the neighborhood in which a proposed use is to be situated is

---

[6] The Trial Court adopted the Trial Court Order as its Pennsylvania Rule of Appellate Procedure 1925(a) opinion for the appeal before this Court. *See* Trial Court Opinion of Court filed July 11, 2023.

[7] When a court of common pleas takes no additional evidence, our standard of review of a zoning hearing board's denial of a special exception is limited to determining whether the zoning hearing board abused its discretion or committed an error of law. *See Monroe Land Invs. v. Zoning Bd. of Adjustment*, 182 A.3d 1, 9 (Pa. Cmwlth. 2018). A zoning hearing board "abuses its discretion when it makes material findings of fact not supported by substantial evidence." *Id.* "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Manor Healthcare Corp. v. Lower Moreland Twp. Zoning Hearing Bd.*, 590 A.2d 65, 70 (Pa. Cmwlth. 1991)).

4

within the Board's discretion, which, considering the record as a whole, it properly exercised in this matter. *See* Board's Br. at 5-13. Likewise, intervenors Eagle Rock Community Association, Inc., and Eagle Rock Resort Co. (collectively, Intervenors)[8] argue that the Trial Court correctly affirmed because the Board's conclusion regarding the incompatibility of the Property's proposed use as a gun range with the residential character of the surrounding neighborhood is supported by substantial and credible evidence. *See* Intervenors' Br. at 7-18.

### III.  Discussion

Initially, we observe that,

> [d]ue to their expertise and experience, a zoning hearing board's interpretation of its own zoning ordinance is entitled to great weight and deference.  The general principle that zoning ordinances must be construed so as to give landowners the broadest possible use of their property gives way where the ordinance, read rationally and as a whole, clearly signals that a more restrictive meaning was intended.

*Hamilton Hills Grp., LLC v. Hamilton Twp. Zoning Hearing Bd.*, 4 A.3d 788, 793 (Pa. Cmwlth. 2010) (internal quotation marks and citations omitted).

The Ordinance empowers the Board to grant special exceptions in the Township. *See* Ordinance, Sections 602 & 1510, R.R. at 692a & 839a-840.  As this Court has explained,

> [g]enerally speaking, a special exception is not an exception to a zoning ordinance, but rather a use which is expressly permitted, absent a showing of a detrimental

---

[8] The Trial Court granted Eagle Rock Community Association, Inc. and Eagle Rock Resort, Co. intervenor status by order dated April 27, 2023.

5

effect on the community. The important characteristic of a special exception is that it is a conditionally permitted use, legislatively allowed if the standards are met.

*Siya Real Est. LLC v. Allentown City Zoning Hearing Bd.*, 210 A.3d 1152, 1157 (Pa. Cmwlth. 2019) (internal citations, brackets, and quotation marks omitted). Further,

> [b]ecause the use is contemplated by the ordinance, there is a presumption that the governing body considered the effect of the use when enacting the ordinance and determined that the use is consistent with the health, safety, and welfare of the community so long as it meets the objective requirements of the ordinance.

*Marr Dev. Mifflinville, LLC v. Mifflin Twp. Zoning Hearing Bd.*, 166 A.3d 479, 483 (Pa. Cmwlth. 2017) (emphasis omitted).

> To satisfy its burden for a special exception, an applicant must establish that the proposed use meets the specific objective criteria of the [z]oning [o]rdinance. These definite criteria are in contrast to the general, non-specific or non-objective requirements such as health and safety. Once the applicant establishes compliance with the specific criteria, it is presumed that the use is consistent with the promotion of the public health, safety, and welfare. The burden then shifts to the objectors to prove to a high degree of probability that the impact from the proposed use will substantially affect the health, safety, and welfare of the community to a greater extent than would be expected normally from that type of use.

*Heisler's Egg Farm, Inc. v. Walker Twp. Zoning Hearing Bd.*, 232 A.3d 1024, 1035-36 (Pa. Cmwlth. 2020) (internal citations, quotation marks, and brackets omitted).

> It is important to appreciate that the burden placed on the objectors is a heavy one. They cannot meet their burden

6

by merely speculating as to possible harm, but instead must show a high degree of probability that the proposed use will substantially affect the health and safety of the community.

*Marr*, 166 A.3d at 483 (*quoting E. Manchester Twp. Zoning Hearing Bd. v. Dallmeyer*, 609 A.2d 604, 610 (Pa. Cmwlth. 1992) (internal quotation marks omitted); *see also Tower Access Grp., LLC v. S. Union Twp. Zoning Hearing Bd.*, 192 A.3d 291, 300 (Pa. Cmwlth. 2018) ("an objector cannot meet his burden with speculation").

Here, per the Ordinance, an applicant for a special exception in the Township bears the initial burden of putting forth evidence

that the proposed use and/or development conforms with all applicable standards and provisions within this Ordinance and the following expressed standards and criteria:

1. The proposed use shall not jeopardize the Community Development Objectives of this Ordinance nor shall it adversely affect the health, safety[,] and welfare of the public and/or the environment.

2. Public services and facilities such as streets, sewers, water, police, and fire protection shall be adequate for the proposed use and/or development.

3. Existing streets and proposed access to the site shall be adequate regarding the width and pavement for emergency service vehicles.

4. Existing streets and proposed access to the site shall be adequate to accommodate anticipated traffic volumes in a manner that avoids undue traffic congestion, and provides for the safety and convenience of pedestrian

7

and vehicular traffic. The proposed use shall not result in unsafe or dangerous traffic conditions.

5. *The proposed use shall be compatible with adjoining development and the character of the zoning district and neighborhood in which it is proposed to be located. The nature and intensity of the operation of the proposed use shall be considered regarding its compatibility or lack thereof.*

6. The proposed use shall not substantially impair the value of other property in the neighborhood where it is proposed to be located.

7. The proposed use and/or development shall not be more objectionable in its operations in terms of noise, fumes, odors, vibration, or lights than would be the operations of any permitted use in the subject Zoning District.

8. The submission of any reports and/or studies, required by the [] Board within the context of the definition "Impact Analysis" as contained defined [sic] in Article 2 of this Ordinance, which conclusively demonstrates that the proposed use or development will not have a negative impact upon the particular subject or subjects as defined by the [] Board, in requiring such reports and/or studies.

9. The proposed use and/or development shall not be injurious to the public interest.

Ordinance, Section 1510.2, R.R. at 839a-40a (emphasis added).[9]

---

[9] We further observe that, "[i]n granting [special exception] approval, the [] Board may attach such reasonable conditions and safeguards as it may deem necessary to implement the purposes of this Ordinance and the Pennsylvania Municipalities Planning Code, [Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§ 10101-11202], as amended." Ordinance, Section 1510.2, R.R. at 840a.

The parties to the instant matter do not dispute that Applicant met the dimensional requirements contained in the Ordinance applicable to the CR District such as minimum lot size, required structure setbacks, and the like.[10] On appeal to the Trial Court, the Applicant challenged the Board's determination regarding certain of the additional "expressed standards and criteria" contained in Ordinance Section 1510.2. Specifically, on review, the Trial Court found that Applicant met its burden regarding Ordinance Sections 1510.2(2), (3) & (4), which pertain to the adequacy of public services, streets, and traffic flow, and that, based on the Trial Court's findings regarding the Board's evidentiary determinations, the Board erred as a matter of law by concluding that Applicant failed to satisfy these Ordinance Sections. *See* Trial Court Order at 7-12, R.R. at 599a-604a. Those Trial Court determinations are not challenged in the instant appeal. Rather, the issue before the Court now is only the question of compliance with Ordinance Section 1510.2(5), which requires the nature and intensity of a proposed use to be compatible with adjoining development and the character of the zoning district and neighborhood in which it is proposed to be located. This was the Ordinance Section 1510.2 requirement upon which the Trial Court affirmed the Board.[11] *See* Ordinance, Section 1510.2(5); *see also* Trial Court Order at 12-13.

---

[10] As discussed *infra*, professional engineer and land surveyor Michael Brinkash testified as to the Ordinance's dimensional CR District requirements, explaining that the Property exceeds the minimum required lot size, meets the required setbacks, and complies with maximum lot coverage percentages and height allowances for properties in the CR District. *See* N.T. at 89-90, R.R. at 333a-34a.

[11] Because Applicant challenges only the Trial Court's determination as to Ordinance Section 1510.2(5), we will contain our discussion to that section of the Ordinance, except as necessary in explaining our disposition herein.

9

Applicant argues that Ordinance Section 1520.2(5) represents a subjective requirement on which Objectors bore the burden of proof. *See* Applicant's Br. at 19-25. We disagree. Whether a special exception requirement is objective or subjective involves statutory interpretation and, accordingly, presents a question of law for which this Court's standard of review is *de novo* and scope of review is plenary. *See Hoffman Mining Co., Inc. v. Zoning Hearing Bd. of Adams Twp., Cambria Cnty.*, 32 A.3d 587, 592 (Pa. 2011).

This Court has discussed objective and subjective special exception requirements and their respective burdens of proof, as follows:

> Specificity is the essential characteristic of operative special exception requirements in an ordinance. The Pennsylvania Supreme Court has long defined a special exception as one allowable where requirements and conditions [d]etailed in the ordinance are found to exist.
>
> Accordingly, when municipalities have put general, non-specific or non-objective requirements into the ordinance with respect to special exceptions, our decisions have usually not seen such general provisions as part of the threshold persuasion burden and presentation duty of the applicant. [The Commonwealth Court] stated the reason . . . as follows:
>
>> It is in the nature of a special exception to require that the applicant meet reasonably definite conditions, and it would be manifestly unfair to require him to prove conformity with a policy statement, the precise meaning of which is supposed to be reflected in [s]pecific requirements . . . . Any other view would enable [a zoning hearing b]oard to assume the legislative role . . . .
>
> . . . .

10

[A]s to specific requirements of the zoning ordinance, the applicant has the persuasion burden, as well as the initial evidence presentation burden. The objectors have the initial evidence presentation duty with respect to the general matter of detriment to health, safety[,] and general welfare, even if the ordinance has expressly placed the persuasion burden upon the applicant, where it remains if detriment is identified.

. . . .

Where the ordinance attempts to place upon the applicant a burden of proof even more vague in its nature, we have refused to give it effect.

*Bray v. Zoning Bd. of Adjustment*, 410 A.2d 909, 911-12 (Pa. Cmwlth. 1980) (internal citations and quotation marks omitted).

In outline form, the rules concerning initial evidence presentation duty (duty) and persuasion burden (burden) in special exception cases may be restated as follows:

Specific requirements, e. g., categorical definition of the special exception as a use type or other matter, and objective standards governing such matter as a special exception and generally:

The applicant has both the duty and the burden.

General detrimental effect, e. g., to the health, safety and welfare of the neighborhood:

[The o]bjectors have both the duty and the burden; the ordinance terms can place the burden on the applicant but cannot shift the duty.

General policy concern, e. g., as to harmony with the spirit, intent or purpose of the ordinance:

11

> [The o]bjectors have both the duty and the burden;
> the ordinance terms cannot place the burden on the
> applicant or shift the duty to the applicant.

*Bray*, 410 A.2d at 912-13 (internal citations omitted).

In *Bray*, the Court described the difference between a general policy concern and an expressed standard that is objective enough to form part of an applicant's burden. The Court observed:

> Criterion (h), effect upon the comprehensive plan or area redevelopment plan, is sufficiently specific that we distinguish it from the general policy criterion of harmony with the spirit and purpose of the zoning; in the context of the Philadelphia Code, both an area redevelopment plan and the "Comprehensive Plan" are explicit documents to which reference may be made. In this case, no redevelopment plan has been mentioned, and the Comprehensive Plan calls for commercial use in this location. The expressed opposition of the City Planning Commission to "piecemeal development of this site" is an opinion external to the official plans.

*Bray*, 410 A.2d at 914.

Here, Ordinance Section 1510.2(5) requires that "the proposed use be compatible with adjoining development and the character of the zoning district and neighborhood in which it is proposed to be located" and that "[t]he nature and intensity of the operation of the proposed use shall be considered regarding its compatibility or lack thereof." *Id.* The measurement of the nature and intensity of the proposed use of the Property as a gun range against the known composition of the adjoining properties as single-family homes and the residential character of the neighborhood and zoning district suffices to allow Applicant to objectively and quantitatively demonstrate Section 1510.2(5)'s required compatibility. *See Bray*,

12

410 A.2d at 914.[12]  Accordingly, we undertake an analysis of whether Applicant's burdens of initial evidence presentation and persuasion have been met in this case. *See id.* at 913.

Applicant called multiple witnesses to testify before the Board to satisfy its initial burden, including the requirements of Section 1510.2(5), at the hearing on the Application.  First, Applicant's principal, Dan Cogan, testified before the Board. *See* N.T. at 14-84 & 144-51; R.R. at 258a-328a & 389a-96a.  Cogan explained that he had been looking for more than two years to purchase a property for himself and his family for the purpose of general vacationing and recreation, including hiking, camping, and use as a private gun range, and that the Property fit the bill when he saw it.  *See* N.T. at 17, R.R. at 261a.  As a result of Cogan's desire to acquire such a tract of land, Applicant entered into an Agreement of Sale for the Property, which remains active.  *See* N.T. at 14, R.R. at 258a.  Cogan explained that the Property will

---

[12] The case of *Siya Real Estate LLC v. Allentown City Zoning Hearing Board*, 210 A.3d 1152 (Pa. Cmwlth. 2019), is distinguishable.  In *Siya*, this Court considered a zoning ordinance provision that required, in the process of considering the approval of a special exception use, the zoning hearing board to "consider whether the total impact upon the neighborhood and parking needed for all uses on the lot after the new use would be in operation would exceed the total impact of all uses on the lot that existed prior to the application."  *Siya*, 210 A.3d at 1155.  The Court found that "total impact" was "not sufficiently defined to be considered a specific requirement" as it can involve the evaluation of many characteristics that are not specifically enumerated.  *Id.* at 1159.  Here, the comparison required is more concrete.  This is not a request for the general detrimental impact or effect and it is not a general policy concern, both of which would be Objectors' duty and burden to establish.  *See Bray*, 410 A.2d 913.  As we noted in *Bray*, "the effect upon a comprehensive plan or area redevelopment plan is sufficiently specific that we distinguish it from the general policy criterion of harmony with the spirit and purpose of the zoning[.]"  *Id.* at 914.  Likewise, here, we find the requirement that "[t]he proposed use shall be compatible with adjoining development and the character of the zoning district and neighborhood in which it is proposed to be located" to be sufficiently specific in that it requires a comparison of the nature and intensity of the proposed private recreational gun range to known residential adjoining properties and the Conservation Residential District, which is defined in the Zoning Ordinance.

13

not be used as a commercial firing range, but instead that he intends the proposed gun range to be used by family and friends, as a facility for hosting long-range firearms trainings, and to host Precision Rifle Series (PRS) matches.[13] *See* N.T. at 17-20, R.R. at 261a-64a.[14]

Cogan testified that the PRS shooting matches hosted at the proposed gun range will occur on Fridays and weekends. *See* N.T. at 27, R.R. at 271a. He explained that the one-day PRS matches will typically occur on Saturdays, with shooting occurring between the approximate hours of 8:30 a.m. and 3:00 p.m. *See* N.T. at 27-29 & 147-48, R.R. at 271a-73a & 392a-93a. Shooters can come to one-day matches on Friday to zero their rifles at the range and train, although only about 30% of shooters do so. *See* N.T. at 27-28, R.R. at 271a-72a. Two-day PRS matches will operate on the same approximate 8:30 a.m. to 3:00 p.m. schedule as the one-day matches, but will span both days of a weekend instead of only Saturday.[15] *See* N.T. at 29-30 & 148, R.R. at 273a-74a & 393a. In addition to formal PRS matches, Cogan also intends to host two or three non-scored one-day informal practice matches annually. *See* N.T. 30-31, R.R. at 274a-75a. In total, Cogan hopes to host 8 to 12

---

[13] The Precision Rifle Series (PRS) is an organization for firearms enthusiasts that holds shooting competitions in two different divisions: the professional series, which contests its series over a number of two-day matches; and the regional series, which contests its series via one-day matches. *See* N.T. at 19-20, R.R. at 263a-64a. The matches primarily employ bolt action rifles and involve multiple timed challenges of precision shooting of varying shots, distances, and shooting positions. *See* N.T. at 24, R.R. at 268a. Participants include law enforcement officials, military personnel, and regular civilians. *See id.*

[14] Cogan further explained that he may also use the Property as a retirement property someday in the future. *See* N.T. at 18, R.R. at 262a.

[15] The two-day PRS matches are the Professional Series PRS matches and they consist of basically double the number of targets of the one-day PRS events. *See* N.T. at 29-30, R.R. at 273a-74a.

14

one-day PRS matches and one two-day PRS match per year. *See* N.T. at 147, R.R. at 392a.

Cogan also explained that he intends to host firearms training at the proposed gun range on 10 to 14 weekends per year. *See* N.T. at 31 & 147, R.R. at 275a & 392a. These trainings will typically run Friday through Saturday and will consist of five instructors teaching approximately 20 to 21 students.[16] *See* N.T. at 27, 31-32 & 147, R.R. at 271a, 275a-76a & 392a. Aside from the PRS matches and the 10 to 14 weekends of training, Cogan testified that the proposed gun range would be used only by family for the remainder of the year. *See* N.T. at 33 & 148, R.R. at 277a & 393a.

Cogan also testified regarding sound testing conducted to determine the decibel levels experienced at various parts of the Property attendant to the firing of different firearms at the proposed gun range. *See* N.T. at 33-43, R.R at 277a-87a. Cogan explained that the testing measured the decibel level[17] of three different firearms – shotgun, modern sporting rifle (semi-automatic), and bolt action rifle[18] – at five different locations on the Property over two days of testing. *See* N.T. at 34-35, R.R at 278a-79a. Cogan explained that a baseline sound measurement was taken

_____

[16] Cogan explained that the trainings will be run by an outfit called Ghost Firearms Training, the owner of which is a retired United States Marshal with extensive experience in law enforcement and firearms training and with whom Cogan has been familiar for several years. *See* N.T. at 31-32, R.R. at 275a-76a.

[17] The sound testing measurements were taken using two Nti XL2 sound level meters, which conform to ANSI S1.4 criteria for Type 1 sound level meters. *See* Metropolitan Acoustics Environmental Sound Study Report (Sound Study) at 2, R.R. at 218a.

[18] Specifically, the shotgun, semi-automatic rifle, and the bolt-action rifle were a 12-gauge shotgun, an AR-15 (.223 Remington), and a 6mm BR, respectively. *See* Sound Study at 2, R.R. at 218a.

at each location, followed by measurements of the sound levels at those locations created by the discharge of the various firearms at the proposed gun range. *See* N.T. at 35, R.R. at 279a. The baseline measurements at the five locations were between 42 and 50 decibels. *See* N.T. at 36, R.R. at 280a. The highest decibel level observed during the testing was 65 decibels. *See* N.T. at 37-41, R.R. at 281a-85a.[19] No suppressors were used on the firearms during the testing. *See* N.T. at 46, R.R. at 290a. Using these sound testing results, Cogan stated that, based on his professional

---

[19] Cogan testified that the decibel levels observed by firing unsuppressed firearms at various locations around the Property were as follows:

- Location One: shotgun – 45 decibels; semi-automatic rifle – 50 decibels; bolt action rifle – 61 decibels.
- Location Two (off the road near the Cove Village Administration Building): baseline – 47 to 50 decibels; shotgun – 56 decibels; semi-automatic rifle – 54 decibels; bolt action rifle – 56 decibels.
- Location Three (at the edge of the Property between the target property and Cove Village Association): baseline – 42 to 44 decibels; shotgun – 51 decibels; semi-automatic rifle – 65 decibels; bolt action rifle – 62 decibels.
- Location Four (at the end of the Property as depicted on the Exhibit): baseline – 42 decibels; shotgun – 44 decibels; semi-automatic rifle – 45 decibels; bolt action rifle – 45 decibels.
- Location Five (corner of the Property): baseline – 43 decibels; shotgun – 44 decibels; semi-automatic rifle – 45 decibels; bolt action rifle – 44 decibels.

*See* N.T. at 36-42, R.R. at 280a-86a. Cogan further explained that additional testing was conducted at a sixth location at the bottom of the mountain effectively right off Route 924 on August 4, 2022, which testing yielded a baseline sound level of 42 to 45 decibels and readings of 45 decibels for the shotgun, 46 decibels for the semi-automatic rifle, and 43 decibels for the bolt action rifle. *See* N.T. at 45, R.R. at 289a.

16

opinion, the measured decibel levels were within acceptable decibel levels.[20]  *See* N.T. at 42, R.R. at 286a.

Applicant next presented professional engineer and land surveyor Michael Brinkash to testify before the Board.[21]  *See* N.T. at 85-116. R.R. at 329a-60a.  Brinkash explained that Cogan retained him to conduct plan research for the Property and for the proceeding before the Board.  *See* N.T. at 85, R.R. at 329a.  Brinkash explained that the Property where the proposed gun range is to be situated consists of three parcels totaling 526 acres located in the Township's CR District.  *See* N.T. at 86-88, R.R. at 330a-32a.  He noted that a public recreation facility is a permitted use in the CR District and that a private recreation facility is permitted in the CR District by special exception.  *See* N.T. at 89, R.R. at 333a.  Brinkash further testified that the Ordinance does not list the specific proposed use – a gun range – as a prohibited use in the CR District.  *See* N.T. at 89, R.R. at 333a.

Regarding the minimum size requirements for properties in the CR District, Brinkash explained that the Property exceeds the required minimum area of two acres with a 200-foot width.  *See* N.T. at 89, R.R. at 333a.  Regarding required setbacks, Brinkash explained that the proposed use complies with the required 50-foot front and rear setbacks as well as the 25-foot minimum side setback.  *See* N.T. at 90, R.R. at 334a.  Additionally, Brinkash testified that the proposed use does not

---

[20] By way of comparison, Cogan explained that a car driving down the road at the time of testing measured 67 decibels.  *See* N.T. at 38, R.R. at 282a.

[21] Brinkash has been a professional engineer in the Commonwealth of Pennsylvania for 20 years.  *See* N.T. at 85, R.R. at 329a.  Over his career, he has prepared land development plans, site plans, and plans for the purpose of zoning hearings.  *See* N.T. at 85, R.R. at 329a.  Brinkash has testified before the Township and other townships in his professional capacity, and he has been accepted on multiple occasions as an engineer for the purpose of giving testimony.  *See* N.T. at 85-86, R.R. at 329a-30a.

17

exceed the 15% permitted lot coverage and no proposed facilities will exceed the allowed 35-foot height limitation. *See* N.T. at 90, R.R. at 334a. Brinkash explained that the closest house in any direction from the proposed firing line is half a mile. *See* N.T. at 101, R.R. at 345a. He further testified that other, permitted CR District uses such as mineral extraction create more noise, fumes, and odors than the proposed gun range use. *See* N.T. at 96-97, R.R. at 340a-41a. Ultimately, Brinkash concluded that the proposed use would not be injurious to the public interest. *See* N.T. at 98, R.R. at 342a.

Environmental scientist Richard Peddicord, Ph.D.,[22] also testified before the Board on Applicant's behalf. *See* N.T. at 117-31, R.R. at 361a-75a. Peddicord testified that Cogan approached him because he wanted to be environmentally responsible in reference to the possible purchase and use of the Property as a private gun range. *See* N.T. at 120, R.R. at 364a. Peddicord testified that he examined the Property and found it to be as well suited a site to build a gun

---

[22] Peddicord has a Ph.D. in environmental science. *See* N.T. at 118, R.R. at 362a. He has worked on lead at shooting ranges for over 35 years. *See* N.T. at 118, R.R. at 362a. His entire business over the past 20 years has consisted of working to help design and operate shooting ranges consistent with environmental regulations through the application of good science and sound engineering. *See* N.T. at 118, R.R. at 362a. Peddicord has drafted guidelines on the environmental aspects for the construction and management of outdoor shooting ranges for the National Shooting Sports Foundation. *See* N.T. at 119, R.R. at 363a. He has written sections on the environmental aspects of outdoor shooting ranges for the National Rifle Association's (NRA) range sourcebook, which is the industry standard for the design and operation of shooting ranges. *See* N.T. at 119, R.R. at 363a. Peddicord has also worked with the United States Environmental Protection Agency (EPA) applying EPA regulations to outdoor ranges and contributing to the drafting of the EPA document titled "Best Management Practices for Lead at Outdoor Shooting Ranges," the guidance of which has been accepted by the Pennsylvania Department of Environmental Protection. *See* N.T. at 119, R.R. at 363a.

range as any he has come across.[23]  *See* N.T. at 125, R.R. at 369a.  Peddicord explained that the Property's soil is well within the range of soil acidity that the United States Environmental Protection Agency (EPA) considers optimal for minimizing the dissolving of lead and stated that, ultimately, from an environmental perspective, the Property is as desirable a piece of property as one is likely to find for the purpose of constructing a firing range.[24]  *See* N.T. at 125-26, R.R. at 369a-70a.

Applicant next presented the testimony of gun range architect Lorin Kramer.[25]  *See* N.T. at 152-74, R.R. at 397a-419a.  Kramer testified that Applicant retained him as a consultant to recommend safety features and design the firing ranges on the Property.  *See* N.T. at 152, R.R. at 397a.  Kramer explained that no federal, state, or local statutes contain specific range design requirements.  *See* N.T. at 154, R.R. at 399a.  He did, however, outline multiple safety recommendations for the proposed gun range that, in his professional opinion, if implemented, would

---

[23] Peddicord has consulted on the design and management of 182 gun ranges in 32 different states.  *See* N.T. at 125, R.R. at 369a.

[24] Peddicord stated that his analysis assumed the range would be mainly a rifle range, but explained that the lead analysis would not change if shotguns were used at the range as well.  *See* N.T. at 127, R.R. at 371a.

[25] Kramer is an architect licensed in 11 states, but not Pennsylvania.  *See* N.T. at 153-54, R.R. at 398a-99a.  Shooting range design accounts for 100% of his business and he has designed shooting ranges in approximately 30 states.  *See* N.T. at 153, R.R. at 398a.  He has worked for the NRA's Range Services for years and was a speaker at the NRA's range conferences from 1993 through 2009.  *See* N.T. at 153-54, R.R. at 398a-99a.  He is affiliated with the NRA, the Law Enforcement Alliance of America, and the International Shooting Coaches Association, and he is a member of multiple state associations, including Arizona, New Mexico, and Colorado.  *See* N.T. at 157, R.R. at 402a.  Kramer has been accepted as an expert witness by multiple courts in the area of range design and safety.  *See* N.T. at 154, R.R. at 399a.

ensure the proposed gun range's safe operation.[26]  *See* N.T. at 157-69, R.R. at 402a-15a.  Kramer explained that the implementation of the suggested safety features would result in much safer range operation than the non-range firing currently occurring on the Property.  *See* N.T. at 170, R.R. at 415a.

Acoustical consultant Felicia Doggett appeared as Applicant's final witness before the Board.[27]  *See* N.T. at 175-233, R.R. at 420a-77a.  Doggett is the President and Chief Executive Officer of Metropolitan Acoustics, a company she founded in 1990 that provides services in acoustics, vibration, and sound propagation modeling.  *See* N.T. at 175-76, R.R. at 420a-21a.  Metropolitan Acoustics has done acoustical analysis work for approximately 10 different gun ranges in the past.  *See* N.T. at 204, R.R. at 449a.  Doggett testified that Cogan retained Metropolitan Acoustics to provide acoustical consulting regarding the proposed gun range.  *See* N.T. at 177, R.R. at 422a.

Doggett explained that Metropolitan Acoustics conducted sound testing at various locations on the Property and prepared the Metropolitan Acoustics

---

[26] Kramer's recommendations include: (1) posting range safety rules at firing locations; (2) requiring shooting supervision by range officers; (3) requiring eye protection and hearing protection; (4) having first aid kits present at firing areas; (5) requiring a telephone or cellular service availability in the firing areas; (6) requiring the presence of an earthen backstop constructed within certain specified design dimensions; (7) the absence of protrusions in the target area to avoid possible bullet ricochets; and (8) not allowing firing of firearms within 30 feet of a backstop or steel target.  *See* N.T. at 158-69; R.R. at 403a-14a.  Cogan stated that, if the Board approves the proposed use, Applicant is willing to adopt all Kramer's safety recommendations for the proposed gun range.  *See* N.T. at 173, R.R. at 418a.

[27] Doggett is board certified by the Institute of Noise Control Engineers, which certifies completion of the fundamentals of noise control and administers an eight-hour professional examination, like a professional engineering license, but dealing instead with the field of noise control engineering.  *See* N.T. at 176, R.R. at 421a.  Doggett is also on the Board of Noise Control Engineers and is a member of the Acoustical Society of America.  *See* N.T. at 176, R.R. at 421a.

20

Environmental Sound Study Report (Sound Study) dated September 20, 2022. *See* N.T. at 177-78, R.R. at 422a-23a; *see also* Sound Study at 2, R.R. at 218a. Doggett testified that the sound testing was conducted using standard techniques and in accordance with all regulations and industry standards. *See* N.T. at 182 & 185, R.R. at 427a & 430a. Doggett explained that the testing was conducted at five receiving locations where the sound levels were measured from two testing locations where shots were fired.[28] *See* N.T. at 182-83, R.R. at 427a-28a; *see also* Sound Study at 2, R.R. at 218a. The testing consisted of shooting three different firearms at the testing locations: a 12-gauge shotgun, a Remmington .223, and a bolt-action rifle 6mm BR, each fired three times within a span of approximately 60 seconds. *See* N.T. at 183, R.R. at 428a; *see also* Sound Study at 2, R.R. at 218a. Doggett then discussed the findings of the sound testing at the various receiving locations, which findings are summarized in the chart depicted in the Sound Study. *See* N.T. at 186-88, R.R. at 431a-33a; *see also* Sound Study at 4, R.R. at 220a. Doggett explained that one or two decibels above the background reading is not much of an increase in sound, and that Locations 2, 4, and 5 were basically the same as the background noise. *See* N.T. at 187, R.R. at 432a; *see also* Sound Study at 4, R.R. at 220a. Location 3 was only slightly higher than the background noise. *See* N.T. at 187, R.R. at 432a; *see also* Sound Study at 4, R.R. at 220a. Further, Doggett testified that the decibel levels at Locations 2 through 4 never reached above 55. *See* N.T. at 188, R.R. at 433a; *see also* Sound Study at 4, R.R. at 220a. Doggett conceded, however, that there is an acoustical difference between steady state background, ambient sounds, and

---

[28] Doggett confirmed that the sound measurements were taken using two NTis XL2 sound collectors, which are Type 1 sound level meters, the most accurate type known. *See* N.T. at 182, R.R. at 427a; *see also* Sound Study at 2, R.R. at 218a. The sound level meters were calibrated before and after testing and windscreens were used, which is standard for outdoor sound testing. *See* N.T. at 182, R.R. at 427a; *see also* Sound Study at 2, R.R. at 218a.

impulsive sounds such as gunfire. *See* N.T. at 210, R.R. at 455a. Doggett explained that, because they are impulsive sounds, such sounds are audible even when not above background sound levels. *See* N.T. at 210, R.R. at 455a.

Based on the evidence, the Board unanimously denied the Application on the record at the conclusion of the hearing. *See* N.T. at 244-47, R.R. at 489a-92a. Specifically, *inter alia*, relevant to this appeal, the Board concluded that the Applicant did not meet its burden to establish the criterion required by Section 1510.2(5) that the proposed use of the Property as a gun range will be compatible with adjoining developments and the character of the zoning district and neighborhood in which Applicant seeks to construct the proposed range. *See* N.T. at 246, R.R. at 491a. The Trial Court affirmed the Board. The Trial Court concluded that the proposed gun range did not meet all objective criteria because it would not be compatible with the adjoining development and the character of the zoning district and neighborhood in which it will be located as required by Ordinance Section 1510.2(5), near the residential areas of Cove Village, Eagle Rock Resort, and other residential properties surrounding the location of the proposed range. *See* Trial Court Order at 12-13, R.R. at 604a-05a.

In consideration of the evidence put forth by Applicant, we find no error in the Board's conclusion regarding Ordinance Section 1510.25(5) or the Trial Court's affirmance thereof. Ordinance Section 1510.2(5) requires the proposed special exception use to "be compatible with adjoining development and with the character of the zoning district and neighborhood in which it is proposed to be located." Ordinance, Section 1510.2(5). Section 1510.2(5) also expressly requires that "[t]he nature and intensity of the operation of the proposed use shall be considered regarding [a proposed use's] compatibility or lack thereof[.]" *Id.* There

22

was not evidence presented by Applicant to demonstrate compatibility of the proposed gun range use with the adjoining developments and the character of the neighborhood and the CR Zoning District. In fact, the evidence presented by the Applicant proves the opposite.

The cases of *Copeechan Fish & Game Club v. Zoning Hearing Board of North Whitehall Township*, 378 A.2d 1303 (Pa. Cmwlth. 1977), and *William Chersky Joint Enterprises v. Board of Adjustment of City of Pittsburgh*, 231 A.2d 757 (Pa. 1967), are instructive to the instant matter. In *Copeechan*, this Court stated that "[e]xcessive noise and its affect upon the surrounding residential area provide a sufficient basis for the denial of a special exception." 378 A.2d 1303, 1305-06. In *Copeechan*, applicants sought a special exception to relocate and expand an existing shotgun range on the property of a shooting club. *See id.* at 1304. Certain neighboring residents objected at the hearing before the zoning hearing board. *See id.* at 1305. One neighbor testified that the shooting range would disrupt her leisurely weekends in the country. *See id.* Another resident complained of the loud sounds from the current shooting and stated that the noise of shooting interfered with the use of his property on weekends, which is when most people are off work. *See id.* This Court found such testimony adequately proved the proposed use would create a nuisance detrimental to surrounding residents. *See id.* at 1306-07. Likewise, in *William Chersky*, our Supreme Court upheld the denial of special exception where the evidence illustrated that a requested special exception would aggravate existing noise level disturbances in the neighborhood where the requested special exception would be located. *See* 231 A.2d at 759-60.

Here, Applicant's evidence illustrated that the area surrounding the Property consists primarily of residential developments, including Cove Village,

Eagle Rock Resort, and other residential properties, and no party challenges this fact. The Sound Study revealed that gunshots at the proposed gun range are audible as increased decibels from various positions around the Property. Doggett's testimony explained that gunfire is audible as an impulsive sound even when not outside of the range of background noise. This evidence was sufficient for the Board to find that the proposed use as a gun range would be inconsistent with the residential character of the area surrounding the Property.

Additionally, the use of the Property and the proposed gun range as a venue for competitive shooting contests and a facility for organized, multi-day firearms trainings represents a marked departure in the nature of the recreational and/or hunting shooting that currently occurs in the CR District. Cogan testified that hosting the competitions and trainings would result in thousands of rounds being fired daily on the Property. *See* N.T. at 27-33, 56 & 147-48, R.R. at 271a-77a, 300a, & 392a-93a. These thousands of rounds fired during competition days and training events will represent a significant increase in the intensity of the shooting currently occurring on the Property and in the CR District as described by Objectors. *See* Ordinance, Section 1520.2(5); *see also* N.T. at 65, 82 & 207, R.R. at 309a, 326a & 452a (Objectors testimony pertaining to current gunfire activity in the CR District). The testimony of Applicant witnesses Doggett and Cogan support the Board's finding that the significant increase in the number of rounds fired during the competitions and training sessions far exceeds the nature and intensity of existing recreational shooting in the CR District. *See*, *i.e.*, N.T. at 65, 82 & 207, R.R. at 309a, 326a & 452a. Accordingly, the evidence was sufficient for the Board to determine that such a proposed use would be incompatible with adjoining residential communities and properties and that Applicant had therefore failed to establish the

24

express special exception criterion required by Ordinance Section 1520.2(5). The Board's denial of the Application based on Ordinance Section 1510.2(5) represents neither an abuse of discretion nor an error of law.

Moreover, we observe that, even if Ordinance Section 1510.2(5) was to be viewed as a subjective factor, a general policy concern, the burden for which would rest with Objectors, the totality of the evidence presented in this matter sufficed for the Board to determine that Objectors had carried their burden. As noted *supra*, this Court has observed that the effects of excessive noise upon a surrounding residential area can provide a sufficient basis for the denial of a special exception. *See Copeechan*; *William Chersky*; *see also Kotzin v. Plymouth Twp. Zoning Board of Adjustment*, 149 A.2d 116 (Pa. 1959) (finding that an increased number of patrons to a property that would cause congested traffic, induce noise, disturb the quiet and peacefulness of the neighborhood could support the denial of a special exception). Here, Objectors testified that the Property is surrounded by residential properties, that gunshots from the Property can currently be heard on those surrounding residential properties, and that the gunshots interfere with Objectors' peaceful enjoyment of their property. *See* N.T. at 57, 64, 82, 104, 207, 209, 230-32, R.R. at 301a, 308a, 326a, 348a, 452a, 454a, 475a-77a. Objectors testified that local traffic and infrastructure are already at capacity; they expressed concerns that the influx of the competitors and attendees of shooting instruction as envisioned by Cogan would stress these resources beyond capacity. *See* N.T. at 59, 65-66, 74, 83, 111-12, R.R. at 303a, 309a-10a, 318a, 327a, 355a-56a.

In addition to Objectors' direct evidence, the Board was entitled to examine the totality of the evidence, including evidence adduced by Applicant, to determine whether the requirements of Ordinance Section 1510.2(5) were met. The

25

totality of the evidence presented in this matter therefore included Doggett's testimony about the decibel levels at various locations around the Property and her explanation that impulsive sounds by their nature can be heard even when not above background sound levels, as well as Cogan's explanation that the proposed competition and training days would result in thousands upon thousands of rounds being fired at the proposed gun range. Thus, even, if compatibility is viewed as a subjective criterion, a general policy concern, shifting the burden to Objectors to prove incompatibility, the entirety of this evidence viewed together sufficed for the Board to find as it did.

Applicant's reliance on *Marr*, 166 A.3d 479, is misplaced, as *Marr* is distinguishable on its facts. In *Marr*, this Court reversed a zoning hearing board's denial, as incompatible with the surrounding area, of a special exception application seeking to place 11 duplexes, or 22 housing units, in an area where only 17 single-family dwellings then existed. The Court determined that the objectors' fears about stormwater management, flooding, and increased traffic were speculative and inadequate to constitute substantial evidence. *See Marr*, 166 A.3d at 484. This Court further found that the objectors did not present evidence illustrating that the proposed use generated effects beyond those normally expected from the type of use proposed. *See id.* The Court also observed that "an increase in traffic is generally not grounds for denial of a special exception unless there is a high probability that the proposed use will generate traffic not normally generated by that type of use and that the abnormal traffic threatens safety." *Id.* (quoting *Accelerated Enters., Inc. v. The Hazle Twp. Zoning Hearing Bd.*, 773 A.2d 824, 827 (Pa. Cmwlth. 2001)) (emphasis omitted). The instant matter differs in that it involves a marked expected increase in gunfire and a corresponding expected decrease in quality of life at the

surrounding residential properties that was not present in *Marr*. Simply put, having new neighbors firing thousands of gunshots is fundamentally different in terms of compatibility with the adjoining area than simply having more neighbors. This point was made clear in the instant matter by Objectors' testimony regarding the annoyance of existing gunfire sounds in the area, Cogan's testimony as to the expected levels of gunfire at the proposed gun range, the Sound Study's observed decibel levels, and Doggett's testimony about the effect of impulsive, as opposed to ambient, sounds. Unlike *Marr*, this evidence was sufficient to allow the Board to properly determine that the proposed use of the Property as a gun range was incompatible with the adjoining development and the character of the zoning district/neighborhood.

## IV. Conclusion

Accordingly, for the above reasons, we affirm the trial court's decision affirming the Board's denial of Applicant's request for a special exception for a private recreational facility.

_____
CHRISTINE FIZZANO CANNON, Judge

27

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Cogan Properties, LLC,             :
                       Appellant   :
                                    :
              v.                 :
East Union Township Zoning Hearing  :
Board, Eagle Rock Community       :
Association, Inc., and Eagle Rock     :   No. 619 C.D. 2023
Resort, Co.                       :

# **O R D E R**

AND NOW, this 12th day of June, 2024, the May 31, 2023 Order of the Court of Common Pleas of Schuylkill County is AFFIRMED.

 

 

_____
CHRISTINE FIZZANO CANNON, Judge